THE PEOPLE *v.* THE RECTOR, &C., OF TRINITY CHURCH *et al.*

The Constitution, in declaring that The People are deemed to possess the original and ultimate property in all lands, affirms a principle of political sovereignty, and does not establish a rule of evidence.

There is no presumption of title in favor of The People, against the actual occupant of land, until it is shown that the possession has been vacant within forty years.

The colonial statutes of New York took effect without the approval of the King. When approved by the Governor, they were valid until disapproved and annulled by the Crown.

The colonial legislature, in 1699, prohibited the Governor from granting land for a longer term than his own continuance in office. In 1702 it repealed this law, and in 1705 Governor Cornbury granted the King's Farm, in fee, to Trinity Church: *Held,* that the confirmation by the Queen in council in 1708, of the colonial act of 1699, and her disapproval of the repealing act of 1702 did not invalidate the Governor's grant or affect any rights acquired under it.

Whether the recitals of this grant in an address by the corporation of Trinity Church to the Crown, and in a legislative report made in 1785, both of which were read in evidence by The People, are *prima facie* evidence of its existence and contents,    *Quere.*

The exception in the Montgomery Charter of the King's Farm, from the lands granted to the city of New York, is not an assertion by the Crown of title to that tract.

The removal by the committee of safety in 1784 of the wardens and vestrymen of Trinity Church, and the appointment of others in their places, had not, nor was intended to have, the effect to divest the property of the church. It only substituted other persons as trustees for the management of the church's estate.

A corporation is a person within the meaning of the statute of limitations in actions commenced by The People.

Though the defendant, entering under a lease for years, could not hold adversely to the grantor during its continuance, that disability was removed when it received a grant in fee in 1705; and the reservation in such grant of a quit-rent does not prevent the grantee from claiming adversely.

APPEAL from the Supreme Court. Action of ejectment commenced in the year 1856, to recover a lot of land on Murray street, in the city of New York, which The People in their complaint claimed to own in fee. The defendants answered as

follows: 1. By denying generally the truth of the complaint: 2. They interposed the statute of limitations as a bar, that is to say, they averred that no right or title had accrued to The People within forty years next before the commencement of the action, and that The People had not within the said forty years received the rents and profits of the land or any part thereof: 3. They alleged that the corporation of Trinity Church had been seised in fee and possessed of the premises since the year 1706, and that the other defendants occupied under that corporation as its tenants. The case was tried in February, 1859, before Mr. Justice SUTHERLAND, and a jury. On the trial it appeared from the plaintiffs' testimony that the lot in question is a part of a tract of land in the city of New York, called under the Dutch Government the Company Farm, and afterwards the King's Farm, the Queen's Farm and the Duke's Farm, and that the defendants, other than Trinity Church, were, when the suit was commenced, in the actual possession of separate parts of the lot, under the title which the Church claimed; that the premises are covered with buildings, which are old and not modern. No witness spoke of having seen the premises more than twenty to thirty years before the trial, but they were then covered with buildings, and occupied. The defendants introduced no evidence, and at the close of the plaintiffs' testimony they moved for a nonsuit, which was granted on the ground that the plaintiffs had failed to establish any title against the defendants, and on the further ground that the action was barred by the statute of limitations. The judgment of nonsuit was affirmed at the general term of the Supreme Court, and The People then appealed to this court. Besides the facts here mentioned, others were proved on the part of the plaintiffs which sufficiently appear in the opinion of the court, delivered by COMSTOCK, Ch. J.

*Charles Tracy*, for the appellants.

*Amasa J. Parker*, for the respondents.

COMSTOCK, Ch. J.   Upon the argument in this court it has been insisted that The People are presumptively the owners of all the lands within the State, and consequently that in the action of ejectment they are always entitled to recover on proving the defendant to be in possession, unless the latter repels the presumption by showing that they do not own the particular premises in controversy.   In support of this position we have been referred to the provision in the State Constitution which declares that "The People of this State in their right of sovereignty are deemed to possess the original and ultimate property in and to all lands within the jurisdiction of the State; and all lands the title to which shall fail from a defect of heirs shall revert or escheat to The People. (Const. of 1846, art. 1, § 2.)   We are also referred to the admitted principle that in the action of ejectment between private parties where the plaintiff has been shown to have been once the owner, the defendant must prove where and how the title has become divested unless he can bar the suit by an adverse possession according to the statute of limitation in such cases.

We are of opinion that the presumption in favor of The People, of universal ownership as a present and existing fact, does not arise upon either of the grounds suggested.   The Constitution, in the clause mentioned, does not declare a mere presumption of a present title which can be repelled by proving a grant from the State, but an absolute rule of political sovereignty, incapable of yielding to any circumstances whatever.   The People "*are deemed*," not presumed, to possess the original, and ultimate property, &c.; in other words, all private titles are held from them as the political sovereignty, as in England all lands are held under the Crown in the same sense. When, by the Revolution, the Colony of New York became separated from the Crown of Great Britain, and a republican government was formed, The People succeeded the King in the ownership of all lands within the State which had not already been granted away, and they became from thenceforth the source of all private titles.   To the same source, also, titles return by reverter or escheat when the person last seised dies,

without heirs capable of inheriting.   The Constitution is simply declaratory of these principles as fixed and unalterable rules of public law.   Its language is quite inappropriate, regarded as the expression of a mere rule of evidence convenient to be used on the trial of an ejectment, but having no conclusive force.   Such was not the intention, and such is not the effect of the clause referred to.   The ownership or right of property therein mentioned is fixed and unchangeable.   It can never pass away from The People by grant or otherwise, because it is the original and ultimate ownership of the political sovereign which is referred to, and not the title or estate which a private person can acquire to himself and his heirs to be holden of the State and subject to escheat.   By whatever name we may call the highest estate of an individual known to our laws, there is a theoretical title in the State of a still higher nature, to which the right of possession and enjoyment become annexed on the failure of the inheritance.   This is the "*original and ultimate property*" spoken of in the Constitution.

Nor can this presumption be sustained by referring it to the rules of evidence which prevail on the trial of an ejectment between private parties.   In such controversies the defendant in possession is presumed to have the title until the contrary appears.   So the plaintiff may prove his title *prima facie* by showing a conveyance from a grantor who was the occupant at the time of the grant.   A prior possession, even without any proof of a paper title, will prevail against an intruder. (2 Greenl. Ev., § 555.)   Now, title in a private person supposes a grant from the State or sovereign power.   The presumptions founded on possession alone, are, therefore, presumptions in favor of such a grant, and no reason can be given why they are not to be recognized when the State itself is the claimant.   A person in possession of land is supposed to have acquired the title which The People, or the sovereign, once held.   This is the general rule, and The People themselves, when they sue, are not wholly exempt from its operation ; yet a strict application of the principle to such cases would be highly inconvenient, because The People, being the source of title, have usually no other means

of proving that they are the owners. An advantage is therefore conceded to them which an individual does not possess. When they are the plaintiffs, the presumption in favor of the defendant, arising from a present occupancy, is shifted to the other side on showing that the possession has been vacant at any time within forty years, which is the period required to bar such an action by adverse possession. This is as far as the adjudged cases have ever gone. (*Wendell* v. *Jackson, ex dem. The People,* 8 Wend., 183; *The People* v. *Denison,* 17 id., 312.) In respect to lands which are wholly unoccupied the presumption may be a just and convenient one that The People are the owners; but when it is not shown that such has been the condition of the property within the period named, no such presumption exists against the actual possession of the defendant. We find no authority for the doctrine asserted on behalf of the plaintiffs, and no case in which it has been even claimed that the State can put a defendant to proof of his title without any evidence whatever, beyond showing that he is the occupant of the land in dispute. Such a doctrine is not only without authority, but we think it is unreasonable in itself. It is a fact of the greatest notoriety that the improved and occupied lands within this State have long since become the subject of private ownership, and that but a very insignificant portion of them belong to The People in their sovereign or aggregate capacity. A presumption, therefore, that they are the universal proprietors is not sustained by the slightest probability.

On the trial of this case The People, it seems, were not content to rest their claim upon the mere presumption which has been considered, and the next inquiry is, whether the testimony introduced on their behalf established a title existing at the commencement of the action. It appears that in August, 1697, Col. Benjamin Fletcher, then Governor of the Colony of New York, under the authority of the Crown of Great Britain, gave a lease of the "King's Farm," of which the premises in question are a part, to the rector and inhabitants of the city of New York in communion with the Protest-

ant Church of England, and their successors, for the period of seven years, at an annual rent of sixty bushels of wheat. Of course, there is no question that the title was then in the King or Sovereign of the Colony. That lease was annulled, as an unreasonable grant, by a colonial act passed in May, 1699, and the same act declared that all future grants of government lands by any Governor for a longer term than his own time of government, should be null and void; but this act was repealed by another passed in November, 1702. In May, 1702, Governor Cornbury, in the name of the Crown, executed a lease of the "King's Farm" to the same rector, inhabitants, &c., and their successors, &c., to hold so long as he should continue Governor, at the said annual rent of sixty bushels of wheat. January, 1704, the rector holding under this lease let the farm to one George Ryerss for the term of seven years, at an annual rent of thirty pounds. This lease purports to be made by the wardens of the church with the consent of the rector and vestry, and in it they refer to the premises as "Her Majesty's Farm on the Island of Manhattan, or New York." There can be and is no question that, at this period, the church corporation held the property acknowledging the title of the Crown. But it does not appear that after May, 1702, any Crown lease was ever given, or that after January, 1704, the church, by any act or declaration down to the present time, ever acknowledged the title to be in the Sovereign of the Colony, or in The People of this State.

It is also shown that, in June, 1708, the Queen, by order in council, confirmed the colonial statute of May, 1699, which prohibited colonial governors from making grants for a longer period than during their terms of office, and disapproved the act of November, 1702, which had repealed that restriction. But before this repealing act was annulled by the Queen in council, and on the 23d of November, 1705, it seems that Cornbury, still the Provincial Governor, in the name of the Crown, granted the farm in question to the church corporation and its successors forever, in fee, reserving a yearly rent of three shillings. In respect to this grant, the plaintiffs insist

that it was void, on the ground that it was made in opposition to the restrictive act of 1799, which was approved in council, and that it cannot be supported by the repealing act of 1702, which was disapproved in the same council in 1708. But the colonial statutes had the force of laws without the approval of the home government, and until they were annulled or disapproved. According to the uniform tenor of the Royal charters and instructions, the power of assenting to or withholding assent from colonial statutes, was conferred on the governors. After being enacted by the provincial legislature and approved by the Governor, they were to be transmitted to the home government for examination, with the proviso, however, that all such laws should be valid and binding until disapproved and rejected by the Crown. (*Instructions to Gov. Dongan,* 3 Colonial Doc., 331; *Commission of Gov. Fletcher,* id., 827; vide, also, vol. 5, pp. 94, 393; Smith's Hist. of N. Y., vol. 1, p. 353, ed. of 1830.) The result then is, that the restriction upon the power of the governors to make grants contained in the act of 1799 was repealed by the act of 1702, and while this act had the force of a law, the grant in fee to the church corporation was made. That grant, being lawful when it was made, did not fail, or the rights under it become divested, in consequence of the subsequent disapproval of the repealing statute by the Queen in council in 1708.

The grant here referred to was not read in evidence at the trial; but its existence was declared in other documents which were introduced on the part of the plaintiffs. It appears that in July, 1713, a bill or information was filed in the colonial Court of Chancery on behalf of the Crown against the rector, inhabitants, &c., in communion with the Protestant Church, complaining that they were tenants of certain lands within the city of New York, for which quit-rents and other services were due to the Crown, and seeking a discovery and account of those rents. Thereupon the church corporation in January, 1714, sent a petition or address to the Queen, setting forth among other things that Governor Cornbury, then become the Earl of Clarendon, had in 1705 granted the King's Farm to the

church and to its successors, at a yearly rent of three shillings, that such grant was rendered disputable in consequence of the said suit, and praying that her Majesty would give directions for stopping the prosecution, and confirming the church in the possession of the farm. In this address the grant referred to is set forth in the following words : " And that noble Lord [Clarendon], imitating the zeal of his Royal mistress for promoting the interest of this infant church, and the settling a lasting foundation for its support, by virtue of the authority given to him by your Majesty under the broad seal of England, did in the fourth year of your Majesty's glorious reign, by your Majesty's letters patent, under the seal of this province, grant the same farme to the rector, and inhabitants of the city of New York, in communion of the Church of England as by law established, and their successors forever, under the yearly rent of three shillings." It also appears that in the year 1785, a legislative report respecting the title to the tract of land formerly known as " The King's Farm and Garden in the city of New York," was made in the Assembly of this State, which report, in setting forth the history of the title, contains the following statement: " That in the year 1705, Lord Cornbury made á grant of the said farm and garden to the church wardens and vestry of the said church, as appears by the record of the said grant, in the Secretary's office of this State, bearing date the 23d day of November, 1705." The grant itself, as I have observed, was not put in evidence, but the plaintiffs did introduce and read the address to the Queen and the legislative report here referred to, in which the fact of such grant having been made, its date and its character, are set forth in clear and precise terms. The patent is stated to have issued under the seal of the province, and in virtue of the Royal authority manifested by the great seal of England, and the estate granted was to be held by the rector, inhabitants, &c., and their successors forever. Now one of these documents thus introduced was the written declaration of the church corporation, and the other that of a committee of the legislature of this State, and neither of them would be evidence for the

defendants if they had not been read by the plaintiffs. But being thus placed before the court and jury I am of opinion that the defendants had a right to insist upon them as evidence in their own behalf establishing the fact *prima facie*, that in the year 1705, the Crown of Great Britain granted the land now in dispute to the ecclesiastical body known as Trinity Church. This is a conclusion, indeed, which was not resisted on the argument before us otherwise than by claiming that the grant was in contravention of the colonial act of 1699, which, as already shown, was repealed by the act of 1702.

I find nothing in the case to impair the force or qualify the effect of the evidence by which the royal patent was proved, or of the patent itself. It is true that in the address to the Throne, the statement of the patent was accompanied by an admission that it was rendered disputable by reason of the suit in the name of the Crown, and the prayer of the address was that an end might be put to the prosecution, and the rights of the church confirmed. But there was no concession that the Crown had any right or title in opposition to the grant. On the contrary the very foundation of the memorial was that the church had the title which ought not to be drawn in question. It is also true that the legislative report set forth other historical facts relating to the King's Farm and the title thereto, and that it concludes with the expression of an opinion on the part of the committee, "that the right and title of the premises were of right before the late Revolution vested in the King of Great Britain and now belong to and are of right vested in The People of this State." It also appears that one branch of the legislature by a vote concurred in the report and conclusion of the committee. But manifestly the opinion of the committee and of the Assembly are of no value unless sustained by the facts which the report set forth. Those facts were, 1. The lease for seven years given by Governor Fletcher in 1697, already mentioned: 2. The colonial act of May, 1699, annulling that lease and confining future grants to the periods during which the governors making the same should hold office: 3. The statute of November 1702, repealing that act:

4. The aforesaid grant in fee made by Lord Cornbury in 1705:
5. The order of the Queen in council in 1708, rejecting the repealing act and approving the original one. These facts have already been considered, and it has been shown that they warrant no conclusion which impeaches the force and effect of the grant. It is scarcely necessary to observe that the opinion of a legislative committee, even when concurred in by the House of Assembly, is not necessarily the law of the land.

The plaintiffs also introduced on the trial the Montgomery charter of the city of New York, dated in 1730, in one part of which the Crown granted to that city the city hall, and all gaols and rooms and places for courts of justice: certain markets, docks and ferries: all waste, vacant, unpatented and unappropriated lands, concluding with an exception in these words: "Gold and silver mines excepted, and also except our Fort George in our city of New York, and the ground, full boundaries and extent thereof and thereto belonging; and also that piece of ground near the English Church, called the Governor's Garden, *and the land called the King's Farm* with the swamp next to the same; and saving to all other persons, bodies politic and corporate, their respective titles to any of the said lands or tenements," &c. It has been argued that this charter, in excepting the King's Farm from the grant to the city of New York, contains an assertion of title thereto on the part of the Crown. If this were so it would be but a mere assertion contained in a public grant to another corporation, which would have no tendency to repeal or impair the previous patent of the farm to the church. Nor would it in any manner affect the rights of the church under that patent. But in truth the excepting clause in the Montgomery charter does not require any such construction. A grantor may except lands either because he does not own and cannot convey them, or because he does not intend to convey them if he is the owner. All that can be said of the Montgomery charter in this connection is, that the lands in question were not included in the grant to the city. It justifies no inference of any value upon the question of title involved in this case.

Another ground on which the title of The People is claimed to rest remains to be noticed. In the year 1779, during the pendency of the revolutionary struggle, the legislature of this State passed an act for the temporary government of the southern district of the State, constituting thereby a council called the committee of safety, with power to make ordinances for the purpose, among others, " of preserving peace and good order in that district." The proceedings of the committee or council were not put in evidence, but an act passed April 17, 1784, relating to Trinity Church, recites the appointment of that committee: that such committee, believing that the dissensions in the church might endanger the peace of the city, did, in effect, determine the places of church wardens and vestry to be vacant, and, by their ordinance dated January 12, 1784, vested the real and personal estate of the corporation in James Duane and eight other persons, to be retained and kept by them or any five of them until further legal provision should be made in the premises. The said act of 1784 then further recited, that certain persons named had been nominated and chosen by a very respectable number of the members of the said corporation and society as church wardens and vestrymen, and that the apppointment of those persons had been prayed for accordingly. The act then proceeded to declare, that the persons thus nominated and chosen should be the wardens and vestrymen of the church, to hold their places until the first usual day of election, which would be after Easter Sunday, in the year 1785. The argument for the plaintiffs is, that the council of safety, by their proceedings, divested the church corporation of its estate and placed it in the nine individuals named in their ordinance: that the State, in the act last mentioned, recognized and confirmed those proceedings without re-vesting the estate in the corporation: that the lands in question were never granted back to the church: that no legal provision having been made on the subject, they were unappropriated lands upon which the Constitution of 1821 and the Revised Statutes took effect, devoting their proceeds to the common school fund. This argument, we think, cannot be sustained.

It was not the intention or effect of the ordinance of the council of safety, as recited in the statute of 1784, to divest the church of any right or estate, but to remove the existing wardens and vestry who had probably espoused the Tory side in the politics of that day, and to appoint other persons in their places to hold the property as trustees of the church temporarily, until further provision by law should be made. The act of 1784 was the further provision by law intended to meet the exigency by appointing new wardens and vestrymen who, from that time, as the legal representatives and trustees of the corporation, became possessed of all its temporalities and estate. They succeeded to the trust which had been reposed temporarily in the nine persons appointed by the committee of safety. There was no intention either on the part of the committee or of the legislature to confiscate the church property, but the design was simply to vest its management in other hands. The old wardens and vestrymen were removed and certain persons put in their places, who, for the time being, were made trustees of the estate; and their places were then filled by the officers appointed by the legislature. What the committee of safety and the legislature desired—and what they attained—was a change in the management of the church affairs, and not a confiscation of its property. This appears to us so plain that we do not pursue the question.

Finally, we do not see any reason why the defence, under the statute of limitations, should not prevail, even if the title were conceded to be in the plaintiffs. So far as we can know from the testimony, the church corporation first took possession of the King's Farm in 1697, under the lease given by Governor Fletcher for seven years. Under that lease (afterwards annulled), and under the one given by Lord Cornbury in 1702, for his term of office, the possession was held until the patent of November, 1705. Thus far, the occupation could not be adverse to the title of the King. But that patent operated as a release of the reversionary interest of the Sovereign; so that, from that time, the possession could be hostile, and, so far as we know, it was so in fact, and has so continued down to

the present time. The address to the Queen, bearing date in January, 1714, shows, in the clearest manner, that the corporation was then in possession, claiming to be owners under the grant in fee. It is true, a quit-rent of three shillings per annum was reserved in the grant; but a reservation of that nature in such a grant does not prevent the grantee from characterizing his possession by a claim of title adverse to all the world. This, I think, was clearly shown by Judge DENIO, in *The People* v. *Van Rensselaer* (5 Seld., 341–343), decided in this court. The conveyance in such cases is of the title, and the quit-rent reserved is in the nature of a compensation therefor; whereas, when the lease is for years, the title remains in the lessor, to which the possession of the tenant is subordinate. It is hardly necessary to observe, that this case in no manner involves the right of the plaintiffs to the nominal quit-rent reserved in the grant of which we are speaking. The claim is to recover possession of the land in opposition to that grant, and to all other pretences of title on the part of the defendants. Nor is it important, upon this inquiry, whether the grant can be, in any manner, impeached or avoided, or even whether it ever in fact existed. The proof is decisive that, as long ago as 1714, the church corporation was in possession of the land in dispute, claiming to own it under a patent from the Crown; and that possession was necessarily adverse to the title of any other real or pretended owner. At that point of time we lose the history of the "King's Farm," so far as any question of possession is concerned, until we come down to a period which is embraced in the testimony of the living witnesses sworn at the trial. Their evidence shows an adverse occupancy at the commencement of the suit, and for many years—less, however, than forty—previous. As far back as their knowledge extended, the premises were occupied, and the particular lot in dispute was covered with buildings.

The matter, then, stands thus: The People prove that, nearly one hundred and fifty years ago, the land was occupied by the church adversely to the sovereign proprietor, and under a claim of title which was earnestly set forth in the address to the

Queen of England. In respect to the next one hundred years and upwards, they give us no information ; leaving us to presume that the same occupation, and under the same claim of right, was continued during all that time. When the history is again resumed, we find a possession of the same character held by the successors of the original claimant and occupant, which is continued to the time of the trial. These facts, and the irresistible presumptions which arise out of them, we think, constitute a bar according to the statute limiting the time for the commencement of suits by The People of this State. By the terms of that statute, The People have declared and agreed that they will not sue or implead any person for or in respect to any lands by reason of any right or title of The People to the same which shall not have accrued within the space of forty years before suit for the same be commenced, unless The People, or those under whom they claim, shall have received the rents and profits thereof within the said space of forty years. (1 R. L., 184, § 1 ; Code of Procedure, § 75.; *People* v. *Arnold,* 4 Comst., 508.) The title of The People, if they have any, did not accrue within forty years before this action was commenced ; and there is no proof, nor will the facts justify a presumption, that they have received rents and profits, or even that the premises have been vacant, within that time. On the contrary, the only presumption which can be admitted is, that, during all the period which is a blank according to the evidence, the condition and occupancy of the property were the same as they are proved to have been at the commencement and the close of that period. I have only to observe, further, that we entertain no doubt that a corporation is " a person " within the meaning of the statutes of limitation, and may avail itself of the defence.

The conclusions to which I arrive are, 1. That the plaintiffs were not entitled to recover on a mere presumption of title without proof: 2. That the evidence failed to show such title, and did prove it to be, *prima facie*, in the corporation of Trinity Church: 3. That the action was barred by the statute of limi-

tations.   The judgment of the Supreme Court must, therefore, be affirmed.

All the judges concurred in so much of the preceding opinion as relates to the defence under the statute of limitations. The court did not pass upon the question whether the recital of the patent to the defendants, in a statement made by themselves, but produced by the plaintiffs, was *prima facie* evidence of such patent.   In regard to the presumption of title in favor of The People, all the judges concurred, except WELLES, J., who dissented for reasons stated by him in another case (the facts in which sufficiently appear in his opinion), between *The People and the Rector, &c., of Trinity Church, Astor, et al.*, defendants (decided at the same term), as follows:

WELLES, J. (Dissenting.)   "The People of this State, in their right of sovereignty, are deemed to possess the original and ultimate property in and to all lands within the jurisdiction of this State." (Const. of 1846, art. 1, § 11; 1 R. S., 718, § 1.)   This declaration of the organic law, it seems to me, establishes incontrovertibly, the proposition that the title to all the lands in the State, is owned and held by, or has been derived, either immediately or remotely, from The People or their predecessor, the Crown of England.   It is equivalent to the most conclusive evidence, that they, at some period in the past, were the absolute owners of all and every part of the lands of the State; and hence, that in an action by them to recover possession of any such part, all that is necessary to prove in the first instance, to sustain the action and put the defendant upon the defence, is, that the defendant was an actual occupant of the premises; or, in case there was no such occupant, that he was exercising acts of ownership thereon, or claimed title thereto, or some interest therein, at the time of the commencement of the action.

In an action by an individual, who should prove by competent evidence title in himself to the premises in question, at any time prior to the commencement of the action, and pre-

The People *v.* The Rector, &c., of Trinity Church *et al.*

cisely such a possession in the defendant as was proved in this case, no one, I apprehend, would dispute the plaintiff's right to recover. The defendant, under such a state of the evidence, would be put upon his defence; and unless he should be able to show a better title or establish a good adverse possession, or interpose some other legal impediment to the plaintiff's recovery, he must inevitably be defeated in the action. In a case where the People are plaintiffs in the action, the only difference is, that the plaintiffs are relieved from proving title in themselves in the first instance, for the reason that by their right of sovereignty they are deemed to possess the title. It is a legal necessity that there must be some original source or fountain of title to all the lands within the State. That source is properly declared to be the People of the State in their collective and sovereign capacity. Such being the case, it would be absurd to require them to give any evidence of their title, until it should be shown that they had at some time parted with it, or that there was some other legal bar to the action (*The People* v. *Arnold*, 4 Comst., 508.)

The present action was commenced in December, 1856, and was tried at the Circuit in the city of New York in February, 1859. Upon the trial, the plaintiff gave evidence tending to prove that, at the time of the commencement of the action, the defendants, Beames and Tinken, were in possession of some portions of the premises in question, and that they continued so in possession for about a year and a half as tenants of the defendant, Hallock, they paying rent to him. There is an entire absence of evidence of possession in any one prior to theirs, except what may be inferred, or rather conjectured, from the fact that, when the witness first saw the premises within a month before the commencement of the action, there was a house upon them, but it did not appear when it was built, how long it had been there, whether it was old or new, nor whether it had ever had a previous occupant. There was nothing else tending to show any right or title in the defendants, or either of them, to any part of the premises. Under this state of the evidence, the presumption does not arise that the defendants, or either of

them, had the title, nor that their possession had been of any greater duration than the evidence showed it to have been. Unless such presumption did arise, the plaintiffs were *prima facie* entitled to recover.

It is claimed on the part of the defendants that the State can only rest on a presumption of right, without affirmative evidence of title, in an action of ejectment, when the land is vacant; and that to enable the State to avail itself of that presumption, it must be proved that the premises were vacant and unoccupied within the period necessary to be shown to establish an adverse possession against the State; that is to say, within forty years next before the commencement of the action.

It seems to me, that to sustain these positions, would be to reverse a well settled rule of presumption. It amounts to this: the State comes with her acknowledged right of eminent domain, and asserts her original and ultimate title to the land. That title is paramount to all others. It is beyond dispute. It is not a mere presumption, but an absolute intrinsic verity, unquestioned and unquestionable. The individual in possession says that the State has parted with her title; and without the slightest evidence of any act of transfer by the People, invokes the rule claimed by the defendants in this case; in other words, he asks the court to presume, from the fact that he is found in possession when the action is commenced, that he and those under whom he claims have been in possession for the period of forty years.

In an action by an individual against a person in possession claiming title, an entirely different rule prevails. If, as before remarked, the plaintiff in such cases proves upon the trial that he was, at any time prior to the commencement of the action, the owner of the land, the defendant is required to justify his possession by evidence sufficient to overthrow the plaintiff's title. One of the ways in which he may do this, is by proving an adverse possession for twenty years. Whatever his defence may be, the *onus probandi* is upon him. If he relies upon the defence of adverse possession, he must prove it, and no pre-

sumption will aid him, which arises from the fact of his being in possession at the commencement of the action, or for any length of time short of twenty years next anterior to that event. These are propositions too familiar and plain to require the citation of authorities to prove.

I confess myself entirely at a loss to perceive any reason why the rule of presumption should not apply as well to the case where the action is brought by an individual as where the People are plaintiffs. The idea of a distinction between the case of vacant premises and of those occupied, as affecting the rule of presumption where the People are plaintiffs, made its first appearance, for the first time, so far as I can discover, in the case of *Wendell* v. *The People* (8 Wend. R., 183, in the Court of Errors). In the report of that case in the Supreme Court (5 Wend. R., 142), nothing appears either in the statement of the case, the arguments of counsel or the opinion of the court, going to show that the premises were vacant; but, on the contrary, it does appear that the defendant was in possession of the premises in question, which it was alleged had never been granted by the State to any one: that to show that the premises had been granted and the title of the State divested, the defendant produced certain letters patent of two certain tracts of land granted to one Thurman, and the whole question was, whether the premises were embraced in the lands described in the letters patent. In the report of the case in the Court for the Correction of Errors, in 8th Wendell, it appears by the statement of the case, that "the proof of title on the part of the plaintiffs was, that thirty years before the trial, the premises were vacant and unoccupied lands; that two years afterwards, one Ruel went into the possession of the land under a pretended contract, and made a clearing, to whose possession the defendant succeeded. The questions discussed in the case in the Court of Errors, were entirely aside from the one whether the plaintiff in the first instance was bound to show that the premises were at any time vacant within the forty years. No allusion is made in the argument to that question. The Chancellor, who delivered the opinion of the

court, says : "The People of this State, upon the declaration of independence, succeeded to all the rights of the Crown, and they are the owners of all the lands within the limits of the State, except such as have been granted to others, or where their title has been lost by adverse possession.  Where lands have never been granted by them, they are presumed to be the owners, until the contrary appears ; and in such cases, they can give no other evidence of their title than that produced on the trial."  The Chancellor then refers to the possession of Ruel and the defendant, and adds: "This was presumptive evidence of right in the People of this State at the time Ruel, under whom the defendant claimed, went into possession."  The residue of the opinion is devoted to the question whether the premises were embraced in the patent.  This is certainly not an adjudication upon the question whether the People were bound to show, in the first instance, that the premises had been vacant within forty years, or that they had been in the receipt of the rents and profits within that time.  The fact that the premises had been vacant was in the case, and the court meant no more than that the facts as proved were evidence sufficient to put the defendant on his defence.  It does not follow, nor is it stated, that it was necessary for the plaintiff to prove the premises vacant at any time.

In the case of *The People* v. *Denison* (17 Wend., 312), NELSON, Ch. J., after asserting the right of eminent domain in the People, adds:  "And in an action of ejectment in their name, proof that the premises claimed were vacant and unoccupied within the period necessary to be shown to establish title by adverse possession against them, is sufficient in the first instance to authorize a recovery," and cites *Wendell* v. *The People* (8 Wend., *supra*).  He then adds: "This proposition necessarily follows from the fact of their being the source of title, as there can be no deduction of it shown, and in ordinary cases, no actual possession."

In the case of *The People* v. *Van Rensselaer* (5 Seld., 291), two opinions were delivered, one by Judge WILLARD, and the other by Judge DENIO.  That by the former, contains, at

page 319, the following passage: " With respect to making out proof of title in themselves, the People have an advantage over an individual. By right of sovereignty they are deemed the owners of all the lands within the State, except such as have been granted to others, or have been lost by lapse of time. Hence it is enough for the People to prove, in the first instance, that the premises in dispute were vacant and unoccupied within a period necessary to constitute an adverse possession against them, and that the defendant subsequently entered or made claim to them." For this the learned judge cites *Wendell* v. *The People* (8 Wend., 183); *The People* v. *Denison* (17 id. 312; 1 R. S., 718, §1), and Constitution (art. 1, § 11); all of which are hereinbefore referred to. Judge DENIO, in his opinion, takes no notice of the question whether it is necessary for the People, in the first place, to show the premises vacant at any time, in order to make out their action on the strength of the presumption of title in their favor. The authorities cited by Judge WILLARD fully sustain the title of the People, unless they have parted with it or have lost it by adverse possession. Upon the question of adverse possession by the defendant for forty years, arising from the fact that he was proved to be in possession at the commencement of the action, they are the merest *dicta*, and entirely unnecessary to the decision of the cases. In the case of *Wendell* v. *The People* (8 Wend., *supra*), it happened that the statement of the case contained the fact that the premises had been vacant at a time within forty years. The Chancellor does not say the People were bound to prove that fact in the first instance, or that nothing short of that would suffice. After stating that the People were owners of all the lands in the State which they had not granted to others, &c., and that where lands have never been granted by them, they are presumed to be the owners until the contrary appears, &c.,—he added the statement that the premises in question in that case were proved to have been vacant at a time thirty years previous to the trial, &c., and then remarked: " This was presumptive evidence of the right of the People of this State at the time Ruel, under whom the defendant claimed, went into pos-

session: as that possession had been held adversely to the rights of the People, sixteen years short of the period then limited for the bringing of actions by them, it became necessary for the defendant to show title out of the State, to rebut that presumption." Nor is it said in any of the cases which followed the one last referred to, that in order to recover the possession, the People were bound to prove the premises vacant at any time, —until we come to *The People* v. *Van Rensselaer*, in 5th Selden, *supra.* In that case we find the following passage in the opinion of Judge WILLARD: "At the time the counsel for the People rested the cause in this case, there was no sufficient evidence before the court to entitle the plaintiffs to recover, or to require the defendants to be put upon their defence. First, there was no proof that the premises had been ever vacant and unoccupied, or that they were, *prima facie*, without the bounds of any patent; and secondly, there was no evidence that the defendants were in possession, or that they claimed title. Although the defendants' possession was asserted in the complaint and admitted in the answer, yet it was denied in the reply. The People are bound by the allegations in their pleadings, like individuals. Notwithstanding the reply was a clear departure from the complaint and, as such, obnoxious to a demurrer, it is still binding upon the plaintiffs. The pleadings and the whole case show, that at the time the plaintiffs rested, they sought, without any evidence of title in themselves, to recover judgment against parties who, their reply asserts, never possessed the lands described in the complaint, and were never entitled to that possession. The judge erred, therefore, in putting the defendants upon their defence." His honor, however, in view of the fact that the cause was subsequently tried upon its merits, and had been fully and ably argued, concluded that it would be more satisfactory to the parties, that the court should pass upon one or more of the questions which would be decisive of the action, not only in that, but in any future litigation upon the same subject. He then proceeds to examine the case upon its merits and shows very clearly that the patents under which the defendants and those under

The People *v.* The Rector, &c., of Trinity Church *et al.*

whom they claimed, held the lands in question, the validity of which was controverted by the plaintiffs, were valid and effectual to bar any recovery by the People; and if otherwise, that the defendants had shown a perfect adverse possession for more than forty years. The learned judge was of the opinion that the plaintiffs should have been nonsuited upon two grounds: 1. That there was no evidence that the premises had ever been vacant, or that they were without the bounds of any patent; and, 2. That there was no evidence that the defendants were in possession, &c., at the commencement of the action. If the second ground was true in point of fact, it would clearly have been a sufficient reason for nonsuiting the plaintiff. With respect to so much of the first as states there was no evidence that the premises were without the bounds of any patent, it seems to me, with all deference, that it was manifestly incumbent on the defendants, and would be more in accordance with the proper order of proof and the rules of evidence, for them to prove that the premises were within the bounds of some patent, than to call on the plaintiffs to prove that they were without such bounds. The remaining part of the first ground, involves the precise question now under consideration in the present case. No question appears to have been raised, at the trial, of the plaintiffs' *prima facie* right to recover before the defendants introduced their evidence; and none was raised by counsel either in the Supreme Court or the Court of Appeals. The defendants relied upon two distinct defences: 1. That the People had parted with their title, and, 2. Their adverse possession for more than forty years;—upon both of which the defendants gave affirmative evidence, and both of which were established.

What the judge means in his concluding remarks upon the question of the plaintiffs' *prima facie* right to recover—that when they rested, " they sought, *without any evidence of title in themselves,* to recover against parties," &c.,—I confess I am at a loss to understand. He had just before fully recognized the rule that the People are deemed the owners of all the lands in

the State, except such as have been granted to others, or have been lost by lapse of time.

I have referred to this case thus extensively, and dealt with it thus freely, for the reason that in the opinion of Judge WILLARD, the only assertion is to be found, as far as I have been able to discover, of the necessity on the part of the People to prove a vacant possession in order to maintain the action; as well as for the reason that it seems to have been very much relied upon by the counsel for the defendants. The fallacy, as I think it is, was allowed incautiously by Chancellor WALWORTH to find its way unnecessarily into his opinion in the case of *Wendell* v. *The People*, and has been adopted as sound law and relied upon by judges in the subsequent cases referred to on the subject, and in all of which cases its adoption was unnecessary to the decisions made. The question is presented in this case I believe for the first time, whether the fact, that the defendant is found in possession at the commencement of the action, authorizes the presumption that his possession and that of those under whom he claims, has been continuous for the period of forty years. In the case of *The People* v. *Arnold* (4 Comst., 508, 513), this court held, that to constitute a bar to the right of entry of the People, there must be such a holding, for forty years, as would constitute a good adverse possession, if the land had been owned by an individual instead of the State.

Upon the whole it seems to me very clear, that in an action by the People to recover the possession of land, all that is necessary for the plaintiffs to show in the first instance is, that the defendant was in possession of the premises claimed at the commencement of the action. That to require them to prove the premises vacant at any time, in order to put the defendant to his defence, would be violating law as well as logic; and would overturn and subvert the doctrine of presumptions in similar cases, as established by a long and unbroken course of judicial decision, and would introduce an unwarrantable distinction in the application of the rule between cases where the

People and those where individuals were plaintiffs. The defence of the statute bar, in question, is an affirmative one, and should be proved like any other affirmative defence.

Judgment affirmed.