## THE PEOPLE OF THE STATE OF CALIFORNIA *ex rel.* THE BOARD OF STATE HARBOR COMMISSIONERS *v.* THE BROADWAY WHARF COMPANY.

COMMON COUNCIL OF SAN FRANCISCO—ITS SALE OF CITY FRONT.— The Act of April 15th, 1850, incorporating the City of San Francisco, did not confer upon the Common Council of that city the power to create by ordinance a Sinking Fund

Points decided.

to pay the indebtedness of the city, nor did it confer upon said Common Council the power to convey, by ordinance, the city front or wharves in the harbor to said Board.

SALES AND LEASE OF WHARVES IN SAN FRANCISCO IN 1851.—The conveyance made by the Common Council of San Francisco, by ordinance of August 23d, 1850, to the Board of Commissioners of the Sinking Fund, of Broadway Wharf, was void for want of power, and the lease of the wharf to Francis Salmon by said Board on the 13th of February, 1851, was also void for the same reason, as was also the conveyance of said wharf, made by said Board of Commissioners on the 24th of May, 1851, to the Commissioners of the Funded Debt, created by the Act of May 1st, 1851.

CASES AFFIRMED.—*Smith* v. *Morse*, 2 Cal. 524, and *Heydenfeldt* v. *Hitchcock*, 15 Cal. 514, as to the power of the Board of Commissioners of the Sinking Fund of San Francisco, created by an ordinance of the Common Council August 23d, 1850, to convey the wharves or city front of said city.

CONFIRMATION OF VOID LEASE.—The confirmation by the Legislature of a lease of a wharf, the property of the State, void because made by a Board of Commissioners who had no power to make it, only vests in the lessee the estate attempted to be created by the lease.

FUNDING ACT OF SAN FRANCISCO OF 1851.—The Act of May 1st, 1851, to fund the floating debt of San Francisco, and creating a Board of Commissioners of the Funded Debt, did not vest in said Board the title to any wharf in San Francisco which belonged to the State.

CONSTRUCTION OF LAWS UPON SAME SUBJECT.—Legislative Acts passed at different times upon the same subject matter are *in pari materia,* and must be read together.

INTEREST OF SAN FRANCISCO IN THE WHARVES.—The charters of San Francisco of 1850 and 1851, by which the power was conferred on the Mayor and Common Council " to erect, repair, and regulate public wharves and docks, and to regulate the erection and repair of private wharves, and to fix the rates of wharfage thereat," did not vest in the city any proprietary interest in the wharves.

RIGHT OF SAN FRANCISCO TO WHARVES UNDER ACT OF MAY 1, 1851.—The Act of the 1st of May, 1851, authorizing the City of San Francisco " to construct wharves at the ends of all the streets which terminate on the bay," etc., and extend the streets six hundred feet into the bay, did not relinquish to the City of San Francisco a proprietary interest in the wharves built on the streets outside the beach and water lot line.

INTEREST OF COMMISSIONERS OF FUNDED DEBT IN WHARVES AT SAN FRANCISCO.— The 14th section of Article III of the Act of April 15th, 1851, incorporating San Francisco, taken in connection with the Act of May 1st, 1851, funding the floating debt of said city, did not give the Commissioners of the Funded Debt of said city any control over or interest in the public wharves in the streets extending beyond the water front, or their revenues.

LEASE OF BROADWAY WHARF IN SAN FRANCISCO.—The lease of Broadway Wharf in San Francisco, made by the Commissioners of the Funded Debt of San Francisco on the 31st of January, 1861, was not valid, and did not confer upon the lessees any right to the same as against the State.

STATUTE OF LIMITATIONS.—A defendant who desires to avail himself of the Statute of Limitations as a bar to the action, must plead the statute. A failure to plead it is a waiver of the same.

APPEAL from the District Court, Fourth Judicial District, City and County of San Francisco.

The plaintiff recovered judgment in the Court below, and the defendant appealed.

The other facts are stated in the opinion of the Court.

*J. P. Hoge*, and *Delos Lake*, for Appellants.

*Edward Tompkins*, and *J. G. McCullough, Attorney-General*, for Respondent.


By the Court, SANDERSON, J.:

This is an action to recover possession of Broadway Wharf in the City and County of San Francisco. A recovery was had in the Court below and the defendant appeals.

The alleged right to the possession, on the part of the State Harbor Commissioners, is founded upon an Act of the Legislature of the 24th of April, 1863, to provide for the improvement and protection of the wharves, docks and water front of the City and County of San Francisco. By that Act the Board of State Harbor Commissioners was created and they were directed and empowered to take possession of the water front, from the line established by the Act of the 26th of March, 1851, to the distance of six hundred feet into the bay, together with all the improvements, rights, privileges, franchises, easements and appurtenances connected therewith, except such portions as were then held under valid leases. (Statutes 1863, p. 406.)

The right to the possession on the part of the defendant is founded upon a lease made by the Commissioners of the Funded Debt of the City of San Francisco, on the 31st day of January, 1861, and which will not expire until the 1st day of May, 1871. Whether this is a valid lease or not, is the ultimate question.

A decision of this question involves the construction of a number of statutes passed by the Legislature, chiefly at its

session in 1851, which do not seem to have been dictated by a policy altogether consistent; and a brief history of these Acts and the circumstances under which they were passed is deemed essential to a proper understanding of the question.

Prior to the adoption of the State government, the officers of the city government of San Francisco assumed, to some extent, governmental functions in relation to the water front, and undertook to provide for the erection and management of wharves, docks and piers.

On the 15th of April, 1850, the city was incorporated, and among the powers conferred upon the Mayor and Common Council was the power " to erect, repair and regulate public wharves and docks; to regulate the erection and repair of private wharves and to fix the rate of wharfage thereat." (Statutes 1850, p. 227.)

On the 23d of August, 1850, an ordinance was passed by the Common Council by which the city undertook to provide a Sinking Fund for the payment of its existing indebtedness, and to create a Board of officers to administer the fund under the style of the Board of Commissioners of the Sinking Fund. In furtherance of this object, the city, by ordinance, caused a conveyance of certain city property to be made to the Commissioners, to be held by them in trust for the purposes aforesaid. Assuming to be the owner of certain wharves known as the Taylor Street, Broadway, Central, Pacific Street and Market Street Wharves, the city caused them to be included in the conveyance.

On the 13th of February, 1851, the Commissioners of the Sinking Fund entered into a contract of lease with one Francis Salmon, by which they undertook to lease to him the Broadway Wharf for a term of seven years, with the right to extend the same to a point not exceeding five hundred feet beyond the eastern line of Front street. This contract was subsequently confirmed by an Act of the Legislature passed on the 1st of May, 1851 (Statutes 1851, p. 313), and thereafter on the 9th of June, 1851, Salmon assigned to the defendant, the Broadway Wharf Company.

On the 26th of March, 1851, "An Act to provide for the disposition of certain property belonging to the State of California"—commonly called the Beach and Water Lot Act—was passed, by which certain property of the State therein described was granted to the city for the term of ninety-nine years, upon certain conditions. The last section of this Act provided that nothing therein contained should be construed as a surrender by the State of her right to regulate the construction of wharves or other improvements, so that they should not interfere with the shipping and commercial interests of the bay and harbor of San Francisco. (Statutes 1851, p. 307.)

On the 15th of April, 1851, the city was reincorporated. (Statutes 1851, p. 357.) The same power over wharves which was conferred by the first charter was continued in the second; and it was further provided that all money received by the city from : First—the net proceeds of all sales of real estate; second—the net proceeds of all bonds and mortgages payable to the city; third—for the occupation of private wharves, basins and piers; fourth—for wharfage, rents and tolls, should continue to constitute a sinking fund for the payment of the existing city indebtedness, and should not be expended for any other purpose. (Sec. 14, Art. III.) And in this connection it was further provided that the Common Council should, at an early day, take steps to fund by ordinance the existing debt of the city (Sec. 15, Art. III) ; and the Commissioners of the Sinking Fund were prohibited from permanently disposing of any property in their possession belonging to the city by sale, lease or otherwise, and required to reconvey and deliver to the city before the tenth of the ensuing May all property, titles, rights and interests belonging to the city. (Sec. 17, Art. III.)

On the 1st of May, 1851, "An Act in relation to the City of San Francisco" (Statutes 1851, p. 311) was passed, by which the city was authorized and empowered to construct wharves at the ends of all the streets which terminate on the bay by extending the streets into the bay not exceeding six

hundred feet beyond the water line as established by the Act of the 26th of March, 1851, and to prescribe the rates of wharfage. By the second section of this Act certain beach and water lot property was relinquished upon certain conditions to the city.

On the same day an Act to fund the floating debt of the city and provide for its payment was passed, by which the present Board of Commissioners of the Funded Debt of the City of San Francisco was created. By this Act the seventeenth section of Article III of the Act of the 15th of April, 1851, reincorporating the city which directed the Commissioners of the Sinking Fund to reconvey to the city was repealed, and they were required to convey to the Commissioners of the Funded Debt, " all the property, and all the rights, titles and interests in property *belonging to said city;* and to pay over into the hands of said Commissioners any funds, notes, securities or other assets belonging to said city which they had received by virtue of the Third Article of the city charter of the 15th of April, 1851 ; and thereafter, in the same section, the Commissioners of the Funded Debt are authorized, at such time and place as in their judgment the interest of the city may require, to expose at public sale, or to lease the property to be conveyed to them, and to apply the proceeds of such sales or leases to the liquidation of the floating debt of the city. The thirteenth section of Article III of the city charter of 1851, which required the Common Council, at an early day, to take steps to fund by ordinance the floating debt of the city was also repealed. (Statutes of 1851, p. 387.)

On the 24th of May, 1851, the Commissioners of the Sinking Fund conveyed to the Commissioners of the Funded Debt, and included in their conveyance the five wharves hereinbefore mentioned.

On the 31st day of December, 1856, the Commissioners of the Funded Debt leased Broadway Wharf to the defendant for the term of seven years, and subsequently, on the 31st day of January, 1861, gave a further lease, which will not expire

until the 1st day of May, 1871.   By their leases the Commissioners only undertook to lease whatever interest they had in the premises, without any warranty or guaranty whatever, and without any covenant for quiet enjoyment, thus showing a want of faith on their part in the validity of the transaction.

*Commissioners of Sinking Fund had no power to convey wharves in San Francisco.*

Parts of the foregoing account have but little to do with the question before us, and have been given mainly as contributing to historical completeness and as exhibiting all the conditions in view of which the Legislature may be presumed to have acted.   This is true of the city ordinances relating to the Commissioners of the Sinking Fund, the conveyance from the city to them, and from them to the Commissioners of the Funded Debt, the lease to Salmon, the Act of the Legislature confirming it, and his assignment to the defendant; for the ordinance creating the Commissioners of the Sinking Fund, and the deed from the city to them, were both null and void for the want of power in the city, (*Smith* v. *Morse*, 2 Cal. 524; *Heydenfeldt* v. *Hitchcock*, 15 Cal. 514,) so no effect was thereby produced upon the title to any part of the city front.   And the same is true of the deed from the Commissioners of the Sinking Fund to the Commissioners of the Funded Debt, by itself considered, for having taken nothing by the deed from the city, the former had nothing to convey to the latter; so whatever the latter took they took by force of the Funding Act, and hence neither the deed from the city to the Commissioners of the Sinking Fund, nor the deed from the latter to the Commissioners of the Funded Debt, served any useful purpose except to point out what particular property belonging to the city was intended to be conveyed to the Commissioners of the Funded Debt by the Funding Act.

*Confirmation of Broadway Wharf lease.*

So with the Salmon lease.   It was void until confirmed by

the Legislature, because the Board of Commissioners of the Sinking Fund was a void Board, and the Act confirming it had no further effect than to confirm it according to its terms, and by its terms it was to expire at the end of seven years. So at the end of that time the Broadway Wharf, in respect to title, reverted to its former condition, so far as affected by the lease or the confirmatory Act. By the Act the State made the contract her own, and vested in Salmon and his assigns the estate thereby attempted to be created, but vested in them no other or greater estate, and vested no estate whatever in the city or any one else.

So, for all the purposes of final judgment, the several matters referred to in this connection may be discarded as having no controlling effect, leaving the case to stand upon the city charters of 1850 and 1851, the Beach and Water Lot Act, the Act in relation to the erection of wharves at the ends of all the streets by extending the streets into the bay, and the *Funding Act.* It is upon them that the strain comes, and it is from them that the validity of the title of the defendant's lessors to the property in question is to be ascertained.

Where so much legislation is invoked for the purpose of establishing a grant by the State, one instinctively suspects that the alleged grant rests upon a slender foundation, or lies in inference rather than direct expression. If the State has relinquished to the city, or the Commissioners of the Funded Debt, property of so much commercial value, and so deserving of the fostering care of the Government, as the water front of the City of San Francisco, we might reasonably expect to find the Act authenticated, in view of the mode uniformly adopted in such cases, by some well defined and formal grant about which there could be no misapprehension; but the most cursory glance, at the various Acts relied upon for the purpose of establishing a grant in the present case, shows that such is not the fact.

### Funding Act.

We have already quoted from the Funding Act all that is

material to the present purpose, and it need not be repeated.
It is clear that no interest passed thereby directly from the
State to the Commissioners of the Funded Debt.   The Act is
cautiously worded and the property thereby intended is
guardedly described throughout as " belonging to the city."
In view of this description no property then belonging to the
State can be regarded as having passed by force of the Act.
For the purposes of the Act the Legislature assumed that the
Commissioners of the Sinking Fund were in the possession of
certain property " belonging to the city."   This property the
Legislature directed them to convey to the Commissioners of
the Funded Debt; but they were not directed to convey any
property which did not respond to that call, and if they under-
took to do so their act was so far altogether nugatory.   If,
then, the Commissioners of the Funded Debt became vested
with the title to the wharf property described in the deed to
them, for the purposes of their trust, they did so because at
that time the property in question belonged to the city and
·not to the State.   Whether it did or not depends upon
the construction of the other Acts already named.   Those
Acts, so far as they touch upon the subject in hand, are *in
pari materia*, and must be read together.

### *City charters of 1850 and 1851.*

The language of the city charters, by which it is claimed
that the State has relinquished the property in question to
the city, is found in tho'se parts of the charters which are
devoted to a specification in detail of the several powers which
are to be conferred upon the city government.   The sections
which contain this language start off in the usual and ordinary
forms approved in such cases : " The Common Council shall
have power within the city to pass all proper and necessary
laws for the regulation and improvement," etc.   Then follows
an enumeration of the various subjects of municipal legisla-
tion, including the erection and repair of wharves, docks and

piers, which are mentioned in the same breath and with as little emphasis as streets, roads, bridges, fences, alleys and sewers; all of which are put upon the same level with wharves, and the power over each is not different, but is of the same municipal complexion. Obviously this is not the language of a grant of a proprietary interest in property. It is but a grant of power to pass all proper and necessary laws for the regulation of such matters as ordinarily fall within the jurisdiction of municipal bodies. It is a grant of municipal power only, and thereby the city acquired no proprietary rights which she would not have otherwise possessed. Under this power to erect and repair wharves and to fix the rates of wharfage, she was undoubtedly enabled to take the revenues to be derived therefrom, but she took them upon precisely the same terms upon which she took those derived from property and license taxes, without any interest in the property taxed or the business licensed, and enjoyed them, as she enjoyed the latter, at the will and pleasure of the State. This power was purely governmental. The Legislature possessed it, but saw proper not to exercise it for a time directly through its own immediate legislative department, but to do so mediately through the legislative body of the subordinate local government. The State could have exercised this power in either mode, and she saw proper to adopt the latter.

*Act extending streets into the bay.*

The same is true of the Act relating to the extension of the streets into the bay, by the construction of wharves. That it was not intended by the language there used to relinquish to the city a proprietary interest in the property of the State lying outside of the beach and water lot line, aside from the obvious scope of the language itself, is made still more apparent by contrasting it with that used in the next section which relates to the beach and water lot property. There the language is: "The right of the State to the beach and water lot property in the City of San Francisco is hereby relinquished

to said city," which is of a very different import.    The latter
is a grant of the State's proprietary interest in the property;
while the former is but the delegation of municipal power
over the subject of precisely the same legal complexion as
that given in the city charters already considered and in the
subsequent charters of 1855 and 1856.

If further testimony as to what the Legislature intended by
the language so far considered be required, it may be found in
the express declaration of that body, contained in the last
section of the Beach and Water Lot Act, which proceeds
upon the theory that up to that time, in the judgment of the
Legislature, they had not relinquished the title of the State to
the city.    That the title was still in the State, notwithstand-
ing the city charter of 1850, is there clearly assumed, if not
declared, and the charter of 1851 certainly conferred no
greater rights than that of 1850.

### Commissioners of Funded Debt.

We now come to the fourteenth section of Article III of
the city charter of 1851 which is relied on as vesting in the
city, and, subsequently, under the operation of the Funding
Act, in the Commissioners of the Funded Debt, a right to the
revenues to be derived from the wharves, at least until the
object of the trust should be in all respects accomplished.    It
provides that all money to be received by the city from cer-
tain sources which are named, including wharfage, rents and
tolls, shall continue to constitute a Sinking Fund for the
liquidation of the city debt, and shall be used for no other
purpose.

At the time the legislative mind was at work upon the
charter of 1851 it was obviously intended to confer upon the
city government the power which the city had attempted to
exercise under the charter of 1850, when it undertook to
create a Sinking Fund by the ordinance of the 23d of August
of that year.    The Legislature then recognized, at least, the *de
facto* existence of such a fund, and provided that all money
to be received from certain sources should continue to go into

that fund; and thereafter, in the next section, directed the Common Council to take steps at an early day to 'fund the debt of the city; and in the second succeeding section prohibited the Commissioners of the Sinking Fund from making any further disposition, by sale, lease, or otherwise, of the property belonging to the city and assumed to be in their possession, and required them to reconvey the same to the city on or before a certain day. From all this it is clear that at that time the Legislature intended to vest the city with power to fund her debt in her own way, and to endow her with the management and control of the wharves and their revenues, for the purpose of paying the debt, without, however, vesting in her any proprietary interest in the wharves or the power to erect them in such a manner as to interfere with the shipping or commercial interests of the harbor, which the city was bound to respect under the provisions and conditions of the Beach and Water Lot Act. Had this scheme been finally adopted it may be conceded that the city would thereby have become entitled to the management and control of the wharves with a view to the enjoyment of their revenues until the Act was repealed or the funded debt paid; or, at least, that such creditors as might have elected to fund their claims would have obtained a hold upon those revenues from which they could not have thereafter been released by any independent action on the part of the State until such claims had been fully paid. But this scheme was not finally adopted; on the contrary, it was abandoned, and another which was on foot at the time, but of an entirely different character, and which found expression in the Funding Act, was adopted in its stead. Instead of allowing the city, as at first proposed, to devise and carry out a plan for funding her debt, the State took the matter out of her hands and undertook the task directly by passing the Funding Act. Thereby certain property belonging to the city in a proprietary sense, and only such, as we think we have already shown, was set apart as a fund with which to liquidate the city debt, and in case of a deficit the Commissioners appointed to take charge

of the matter were authorized to draw on the city for an amount sufficient to pay interest and supply the further sum of fifty thousand dollars annually, as a Sinking Fund for the redemption of the city stock which they were authorized to issue to the creditors of the city in exchange for their claims. But neither the wharves nor wharfage was so set apart or vested in the Fund Commissioners, nor the power over the same which the city acquired by her charters.

What would have been the result had the city undertaken to improve the water front and cause wharves to be erected, and for that purpose had entered into contracts of the character of that made by the Commissioners of the Sinking Fund with Salmon, or of the present contract by the Commissioners of the Funded Debt with defendant, it is idle to inquire. It may be conceded that the contractors with the city would have acquired by such contracts rights which the State could not have impaired. Upon that score it is sufficient to say that the city never undertook to exercise the power which she possessed, although it was continued to her by the charters of 1855 and 1856 in precisely the same language, and was an existing power until the passage of the Act of 1863, by which the State resumed the power and undertook the improvement of the harbor through the instrumentality of the Board of State Harbor Commissioners. The city could not transfer its merely governmental powers to the Commissioners of the Funded Debt, and, if it could, it has never attempted to do so. The power to authorize the construction of wharves and to lease and dispose of them was not vested in the Commissioners of the Funded Debt.

It results that the Commissioners of the Funded Debt never acquired any control over or interest in the Broadway Wharf or its revenues, and that the lease under which the defendant now holds it is not valid within the meaning of the Act of 1863.

### Statute of Limitations.

The point founded upon the Statute of Limitations comes

too late. If, in any event, the bar of the statute was available, it should have been taken advantage of by demurrer or answer. (*Brown* v. *Martin*, 25 Cal. 82.) This was not done, and it is too late to seek its shelter for the first time in this Court. In both of the cases cited by counsel, (*People* v. *Van Rensselaer*, 9 N. Y. 318, and *People* v. *Trinity Church*, 22 N. Y. 46,) the statute was pleaded.

Judgment affirmed.