In the Matter of the Application of the CITY OF NEW YORK to Acquire Title to Wharfage Rights, etc., for the Improvement of the Water Front on the North River from Pier Old No. 1 to Pier No. 7.

Supreme Court, New York Special Term, February, 1924.

*Eminent domain — city of New York — condemnation of piers on North river together with wharfage, cranage and dockage rights — nature and extent of ownership of piers and lands under water — prescription — piers regarded as shedded piers subject to revocation of shedding privilege — awards predicated on fair market values.*

CONDEMNATION proceedings.

*George P. Nicholson*, corporation counsel (*Josiah A. Stover*, of counsel), for City of New York.

*O'Brien, Boardman, Parker & Fox* (*E. J. Freedman*, of counsel), for claimants of Parcels A, C, E and F.

*Barry, Wainwright, Thacher & Symmers, Truman H. Baldwin & Sons* and *Louis C. White* (*Louis C. White, Ralph L. Baldwin* and *Herbert Barry*, of counsel), for claimants of Parcels E, D and G.

TIERNEY, J. The property taken by the city for public purposes is piers old Nos. 1 and 2 on North river and the rights of wharfage,

cranage and dockage appurtenant to said piers and to the bulk-head north of pier No. 1 and north and south of pier No. 2. The piers extend into the river from the west side of West street. Pier No. 1 is opposite to the westerly end of Battery place. The city acquired title by condemnation on June 10, 1921. The questions to be determined are the nature and extent of the private owner-ships and the market values as of that date.

### PARCELS A AND A-1.

This is pier No. 1. It is 600 feet in length and 64.5 feet wide, measured from the northerly side of Battery place and the westerly side of West street. On the south the city has relocated the bulk-head to a point 180 feet west of West street, making the pier about 420 feet in length beyond the bulkhead line on that side.

The pier was originally built by the city in or about 1840. It was 50 feet wide and extended into the river 320 feet from the westerly side of West street.

In 1848 the city conveyed this pier by grant to Cornelius Vanderbilt.

In 1852, by ordinance, the proprietor was directed to extend the pier so as to make its extreme length from the bulkhead 600 feet.

There is no record of authorization for widening the pier from fifty to sixty-four and one-half feet. It is conceded that such was the existing width of the pier for some time before 1873 and it is not disputed that there is a presumption of a grant to use a pier of the additional width from the long user and recognition.

At some time prior to 1870 the pier had been converted in use to a shedded pier. There is no proof of any license having been granted at any time for the erection of a shed upon the pier.

When the pier was originally erected, the state had not granted to the city the title to the lands under water upon which it was to be erected. But it had given the city the right to locate and build piers on those lands. Laws of 1813, chap. 86.

When this pier was built the city acquired a perpetual right to the use of the lands upon which it was built for the maintenance of a pier thereon. This was not a title in unrestricted fee. These lands were within the navigable waters of the state, and, whether the city or the state held title, it was in trust for a public purpose for the benefit of the people and not in the capacity of private ownership. No diversion of ownership or use was permissible except in the aid of commerce and navigation or for some other public purpose. A withdrawal of the open use of some parts of navigable waters to enable piers to be erected in aid of the commercial use of the water highway is necessary but the parts so appropriated cannot be diverted to a different use and the

appropriation or encroachment upon the free use of the waters for navigation is coterminous with the existence of the use for a pier and abates with the discontinuance of that use.

Confusion arises from confounding cases that deal with lands under water within the bulkhead line and lands occupied by piers. The state cannot authorize the appropriation of any lands covered by the navigable waters to the erection of any structure thereon except such as are in aid of commerce and navigation or for a public purpose. But the definition of the location of the line between land and water may be made and altered by the state. The natural shore line does not have to be adhered to or all improvement of a port might cease. The state may extend the shore line, within the limitations prescribed by federal authority, by moving the bulkhead line out into lands formerly covered by navigable waters. When this is done the shore line is not that established by nature but that artificially prescribed. All lands within the bulkhead line become attached to the upland and are susceptible of private ownership like other lands with all the incidents of unrestricted transmission.

The city could not convey to Cornelius Vanderbilt in 1848 the title in fee to the lands under water occupied by this pier. They were beyond the shore or bulkhead line as then established and the title held in trust by the city or by the state for purposes of commerce and navigation could not be alienated to an individual. What it could transfer to him was the pier structure and a franchise to maintain it and the perpetual right to the exclusive use of the lands on which it stood for maintaining a pier thereon and the consent of the city and of the state to the maintaining of such pier. While in form a deed the conveyance was only a franchise or right irrespective of the sale of the physical structure.

The question of the title acquired by Cornelius Vanderbilt is of importance in connection with the following facts. The bulkhead line has been carried out 180 feet from the west side of West street where it was located when the sale was made to him. The pier stands for its first 180 feet within the line of the shore land and not within the future confines of the navigable waters. Piers are confined to navigable waters. A structure inside of the shore line is not a pier. When physical conditions change so that a former pier becomes part of the land it ceases to exist as a pier. A franchise to maintain a pier cannot be converted into a right to maintain a structure upon the land. When the bulkhead is constructed upon the new line there will be no navigable waters for the inshore 180 feet within which this pier can be maintained. Its maintenance as a pier becomes a physical impossibility. It

55

ceases to exist as if it were destroyed and the franchise abandoned. The right or franchise to maintain a pier abates and is extinguished and there is no title left in the proprietor. All his rights that survive are a claim for damages for having destroyed his franchise to maintain his pier by altering the bulkhead.

As respects this right a provision in the deed becomes of commanding importance. It was there provided that the city reserved the right at any time to carry out the bulkheads on either side of the pier to any point or distance " notwithstanding that thereby the said pier may become in part or almost wholly enclosed and the value and usefulness thereof diminished and the said party of the second part shall be entitled to no compensation or reward for such or any damages or injury."

This provision presents no ambiguity. It provides in clearest terms for the very contingency that has arisen. No refinement of reasoning or citation of authorities can deprive it of its plain intent.

As to the parts of the pier that comprise the portions of its extended length and width it is clear that they are the subject of a mere franchise. As I construe the deed to Cornelius Vanderbilt there is no difference in the title of the present proprietors to the different parts of the pier except in the method of acquiring title. They hold a franchise to maintain this pier and that only.

A further question is involved as to the character of the pier that the proprietors were entitled to maintain.

From some time prior to 1870 this pier was inclosed by a shed and used exclusively by the lessee. No license or permit has ever been issued therefor of which there is any record.

Prior to 1875 a shed upon this pier was illegal although the prohibition was quite generally disregarded in practice. Until there was a legal sanction created for inclosing a pier and a provision made for granting the privilege no user could raise a prescriptive presumption of a grant. Between 1870 and 1875 permits to erect sheds on piers were doubtless issued by the department of docks and they were validated by the act of 1875, but there appears no specific authority therefor in the prior statutes. In 1875, by chapter 249, owners were permitted to inclose their piers by sheds provided they obtained the permit of the department of docks.

Prior to 1875 no right could accrue to the owners to maintain a shed on this pier by prescription. Such a title is based on the presumption of a grant that has been lost. As no lawful permit to inclose the pier could have been granted during that period, the action of the owners in maintaining a shed in derogation of the law could raise no presumption of title.

After 1875 the situation was different. It was no longer unlawful for an owner to inclose a pier, only to do so without the license of the department of docks. Since 1875 these owners have continuously maintained a shed upon this pier and used it exclusively as the owner of a shedded pier is entitled to do, as if they had a license or permit to do so. This long-continued user raises a presumption that at some time in 1875 or thereafter a permit was obtained that has been lost, a title by prescription.

It has been held that all permits of this character are subject to legislative revocation, although there be no condition or limitation expressly attached to their creation. Being but permits by their nature they may be withdrawn in some way.

Before being deprived of their title in this proceeding these owners had acquired a right by prescription to maintain a shed on this pier. The only right that could be expressly granted was under a permit or license from the department of docks. I do not think that the presumption of a grant of this right, which is the basis of the owners' title, can go further then to a right to what could have been acquired within the statutory limitation. The presumption is only of a permit or license. That was all that the owners could have obtained by express grant; that was all that they could obtain by prescription.

For a long time the legislature had not provided for a revocation of a shedding license. Unless the right of revocation was reserved by conditions in the permit, the license was indestructible for such time until the legislature should see fit to enact otherwise.

In 1897, however, by section 844 of the Greater New York charter, it was provided "but when such license or authority has been granted and has been acted upon, it shall not be revoked by said commissioner without the consent in writing of the mayor and of the commissioners of the sinking fund, after due hearing of such licensee."

I am of the opinion that this applied to a license whose existence rested upon the presumption of a grant, as in the present case, just as to a license whose existence was evidenced by a record and that by this enactment these owners' rights became subject to revocation by the department of docks by appropriate proceedings.

Such proceedings were attempted to be had in the present instance. To be effectual an opportunity for due hearing must have been afforded the licensee. This made notice a prerequisite. Notice was given to the lessee in possession but none to the owner. I do not think that this was sufficient. A change of the character of the pier was a matter of considerable importance, affecting its value as well as the value of its present use. Irrespective

of the terms of any lease the owner had a substantial interest in opposing this change. The legislature prescribed that it should have a due hearing. It had none when no notice was given to it and action was taken in default of its appearance.

The owners argue further that they have some rights created by the amendment of the city charter by chapter 466 of the Laws of 1901. I do not think that this enlarges the owners' rights in any way.

This added the provision: " Provided that all sheds or structures, lawfully erected or maintained, at the time this act takes effect, upon any wharf or pier in any part of the territory embraced within the city of New York as constituted by this act, are hereby declared to be lawful structures."

Counsel for the owners urges that by this was meant to legalize and declare irrevocably lawful, sheds and structures erected upon piers which had been erected and maintained at the date the act became effective.

This would eliminate giving any meaning to the word " lawfully " as employed in limitation of the words " erected or maintained." If that word be eliminated the provision might read as counsel claims that it means. But that would change its meaning to an important extent. It is a change so easy and obvious to be made, if that were the intent of the legislature, as to suggest that the word " lawfully " was employed or retained with a purpose of giving it a meaning.

The charter created a new board of docks to have jurisdiction to issue shedding permits throughout the greater city. It seems to me that the natural reason for this saving clause was to declare that permits lawfully issued by the authorities of the former localities or lawfully acquired by prescription were to continue in force without a reapplication to the newly-created board, not that they were to be given a new or different sanction. My conclusion is that the rights of these owners that were taken by the city are as follows:

A franchise to maintain a shedded pier of which the shedding privilege was subject to revocation by the department of docks pursuant to section 844 of the Greater New York charter.

As to the first or inshore portion of 180 feet the franchise was subject to be extinguished by the building of a bulkhead by the city on the new line. The franchise would continue only for the period before the construction of the new bulkhead and would then terminate without any right to damages. This pier for this 180 feet had a frontage on the water only on the north side. On the south side it was already inclosed by the new bulkhead.

I find that the fair market value of parcel A on June 10, 1921, was $500,000. In arriving at this conclusion I have regarded it as a shedded pier subject to having the shedding privilege revoked by action of the municipal authorities and have included the value added to the franchise by ownership of the structure of the pier and the shed thereon with due allowance for deterioration and obsolescence. I have regarded it as a pier having right of free access from the shore.

I find that the fair market value of parcel A-1 on June 10, 1921, was $65,000. In arriving at this conclusion I have regarded it as a shedded pier subject to having the shedding privilege revoked by action of the municipal authorities and subject to having the franchise extinguished by the building of a bulkhead on its northerly side by the city without claim to damage. I have included the value added to the franchise by ownership of the structure of the pier and the shed thereon with due allowance for deterioration and obsolescence.

The ownership is as claimed and undisputed by the city.

## PARCEL B.

This is pier No. 2. There is no dispute as to the title.

As in the case of pier No. 1, this pier was inclosed by a shed and used exclusively by the owners from some time prior to 1870. No license or permit has ever been issued therefor of which there is any record.

For the reasons stated in relation to pier No. 1, I am of the opinion that this was a shedded pier with the shedding privilege subject to revocation by the department of docks pursuant to section 844 of the Greater New York charter.

I regard the proceedings that were attempted to be had to revoke the permit as ineffectual as no notice was given to the lessee in possession.

I find that the fair market value of parcel B on June 10, 1921, was $600,000. In arriving at this conclusion I have regarded it as a shedded pier subject to having the shedding privilege revoked by action of the municipal authorities and have included the value added to the franchise by ownership of the structure of the pier and the shed thereon with due allowance for deterioration and obsolescence.

## PARCEL C.

This is the bulkhead, twenty-six and eight-tenths feet in length, immediately north of pier No. 1.

This bulkhead was erected by the city. There is no evidence of an express grant of any rights to wharfage thereover. The record title is conceded to be in the city.

It has been in use by the lessee of the owners of the premises adjoining on the east side of West street since 1857. Those premises were conveyed to the predecessor in title by the city in 1845 but without mention of the bulkhead. A lease was made of the bulkhead by the owner of the upland to the Camden and Amboy Railroad Company in 1857. Since then it has been in continuous use by the lessee and its successors. The city has never exercised any act of ownership.

The record title being in the city the burden of establishing an adverse title by prescription is upon the claimants. The period of possession runs back into such early dates that testimony of living witnesses is hardly available. I think, however, that there is sufficient evidence that there was actual user initiated prior to 1870 under a claim of right and that the right to the use of the bulkhead has been exercised for so many years with the acquiescence of the city that a title by prescription in the claimants has been established.

I find that the fair market value of the rights appurtenant to this bulkhead on June 10, 1921, was $21,440.

### PARCEL D.

This is the bulkhead to the south of pier No. 2, fifty-two and two-tenths feet in length. There is no dispute as to the title.

I find that the fair market value of the rights appurtenant to this bulkhead on June 10, 1921, was $41,760.

### PARCEL E

This is the bulkhead, twenty-two feet in length, immediately north of parcel C.

It is not disputed that the rights of wharfage appurtenant to this parcel are in the claimant.

I find that the fair market value of the rights appurtenant to this bulkhead on June 10, 1921, was $17,600.

### PARCEL F.

This is the bulkhead, nineteen feet in length, immediately north of parcel E.

It is not disputed that the rights of wharfage appurtenant to this parcel are in private owners. The city suggests that the title is in other parties than the claimants, who have, however, not appeared or made any claim.

The record title to these rights appears to be in the devisees of Stephen Whitney, who died in 1861.

The title of the claimant is by prescription and the proofs of user and adverse possession are similar to those in relation to parcel C. There is a further feature of apparent recognition of

the title of the present claimant or of some third person by the owners of the record title, in the action and judgment therein by the trustees under the will of Stephen Whitney, deceased, in 1880, settling the account of their proceedings, in which this nineteen feet of bulkhead is omitted. This strengthens the presumption of some antecedent grant that enabled the present claimant and its predecessors to exercise the rights of ownership for so long a period. I think that a title in the present claimant by prescription has been fairly established and that it would be unfair, in face of these proofs, to impose the burden upon the collection of the award by making this award to unknown owners.

I find that the fair market value of the rights appurtenant to this bulkhead on June 10, 1921, was $15,200.

### PARCEL G.

This is the bulkhead to the right of pier No. 2, seventy-six and three-tenths feet in length. There is no dispute as to the title.

I find that the fair market value of the rights appurtenant to this bulkhead on June 10, 1921, was $61,040.

The corporation counsel will proceed in accordance with this opinion in preparing and submitting an abstract of awards.

Judgment accordingly.