William M. Perry, J.
In this action brought by the Town of Smithtown, Suffolk County, New York, against the defendant, Vito Poveromo, the defendant is charged with a violation of chapter 25B-3 of the code of said town, more specifically, the filling in of property on the foreshore of the Nissequogue River.
During the trial it was established that a landfill operation took place upon property owned and possessed by the defendant. The testimony revealed that fresh fill had been dumped into an area on the north side of Riveria Drive in the Town of Smithtown and that the fill intruded upon a portion of the shore of the Nissequogue River to a point below the mean high water mark.
The applicable sections of the ordinance alleged to have been violated, to wit; Local Law No. 1 of 1970, “ a marine law ”, is as follows:
“ Section 25B-3. Scope of Law. Notwithstanding the prior granting of permission, no person shall remove from or deposit in the bed of any watercourse or wetland, nor remove from any watercourse or wetland, to deposit on any upland, privately owned or owned by the town or any other municipal or governmental authority, any material without obtaining from the Town Clerk a written permit therefor, issued upon the order of the town, as hereinafter provided. This local law shall not apply to the removal or deposition of material in connection with the harvesting of shell fish for commercial purposes.” (Italics supplied.) A violation of the above ordinance is declared pursuant *525 to section 25B-18 to be a misdemeanor and punishable by a fine not to exceed $100.
After trial the defendant moved to dismiss the information upon the following grounds: that the People of the Town of Smithtown failed to make out a prima facie case; that the People failed to prove the guilt of the defendant beyond a reasonable doubt; and, that the ordinance as it related to the defendant was unconstitutional and that it was vague, indefinite and uncertain.
It is well established that legislative enactments carry a strong presumption of constitutionality. (Paterson v. University of State of N. Y., 14 N Y 2d 432; Martin v. State Liq. Auth., 43 Misc 2d 682, affd. 15 N Y 2d 707.)
It is the defendant’s contention that the definition of “wetland ” is so ambiguous and vague that the town could not rely upon the language that was set forth in the ordinance as to the meaning of the word “wetland” and therefore depended on experts to describe what was meant.
The words used by the expert in defining wetland taken from the minutes of the trial follow: “ The wetland definition, which is not mine is the one used over the United States — first of all, we have two kinds, fresh and we have marine, being salt. The salt water wetlands are those lands which are, well, we have two zones. Let me describe it in zones. The first zone is that zone which is the shallow, permanently filled water; six feet deep would be this zone. Six feet below mean low tide to low tide. Then we have the intertidal zone, which includes the cord grass or thatch. Then we have the meadow zone, often time called salt marsh meadow, which is that zone which is your mean high tides or your spring tides.”
The following definition of wetlands is extracted verbatim from the ordinance (Local Laws, 1970, No. 1 of Town of Smith-town) : “ Wetlands — lands generally covered or intermittently covered with water to a depth of six feet or less with fresh, brackish or salt water including but not limited [to] thatch meadows, salt marshes, salt meadows, marshes, swamps, and bogs.”
The court cannot see in the expert testimony any amplification, elaboration or explanation of the language in the ordinance. The definition offered by the expert witness, although expressed in his own words, is substantially the same language and terms as used in the ordinance. The word ‘ ‘ wetlands ’ ’, as defined by him, is clearly understandable, definite and unambiguous.
It is abundantly clear that the technical aspect of the expert testimony was that portion that described tidal flow, vegetation within the tidal zone, and the method used for determining the *526 mean high water mark. This aspect of the testimony is utilized solely for the purpose of illustrating that the area covered by the fill encompassed regions both .above and below mean high water.
The presumed purpose of securing the expert’s definition was to gain assurance that the term as contemplated by him coincided with the term as used in the ordinance. We are satisfied the two views present no inconsistencies.
The court cannot join with the defendant in the opinion that the ordinance as it related to the defendant was unconstitutional for the reasons advanced by him.
Insofar as the ordinance may restrict or inhibit the use which one may make of his privately owned property without compensating him for its diminished utility, is the ordinance abhorrent to the spirit of the constitution?
The question can best be answered only after examining the quality of the ownership, the jus privatum.
The court is satisfied with the relative accuracy of the narrative in the People’s memorandum of law describing the chronology of grants as they relate to the present ownership of the foreshore which is the subject of this action. More important, for our purposes, is the interpretation, of the grants as they affect the quality of such ownership.
The King owned all the public lands and waterways in England. Under the “prima facie rule” laid down in Attorney-General v. Philpott (27 Bea v. R. C. Cas. 107) he acquired the absolute fee to tide waters and tide-flowed lands with an unqualified right (jus privatum) to convey as he saw fit. (Parsons, Public and Private Rights in the Foreshore, 22 Col. L. Rev. 706 [1922].)
The consequences of the rule were so oppressive to the public, that the People lodged what may be termed a strenuous protest. The Crown was forced to relax the rule and qualify it to the extent that, while holding the absolute fee to the land, it held subject to the rights held by the subjects (jus publicum) of fishing and access for navigation. Jus publicum when applied to feudal England meant the King held his preserves and his waters not as an absolute despot, but in trust for his people.
Therefore, in England at least, it was established that the Crown possessed the absolute title to navigable waters and tidelands subject to the rights of the public, as represented by Parliament, to make use of the King’s property for the purpose of fishing and navigation. In order that .a conveyance of such territory be given full effect, it would be necessary for the Parliament to join in the transfer.
*527 The governing rule in the colonies with respect to interests in public lands was determined on the basis of the Crown’s claim to the territory. All the territory of the colonies, with the exception of New York, was held under a claim of discovery. Accordingly, the “ prima facie ” rule, as applied in the mother country wherein the jus privatum was held by the King subject to the jus publicum, was also applicable to all Crown grants in the colonies.
New York, however, was retaken from the Dutch in New Amsterdam by force of conquest. The Crown’s claim here was based on discovery and conquest and vested in the King an absolute title to the land, independent of parliamentary authority, “ until such time as the conquered land should be acquired under a Royal Charter ”. The Province of New York never received a charter from the Crown and had the distinction of being the only province among the 13 original colonies held as a conquered territory under the uncontrolled rule of the King, down to the Revolution of 1776. Quite possibly the jus privatum and jus publicum may have been merged in the King’s title independently of the prima facie rule. “ Prom that time on until the new State -of New York was born the Province of New York wended its solitary way as the only one of the Thirteen Original Colonies held as a conquered province in the power of an absolute ruler who by a strange provision of English Common Law was Sovereign on the throne of a then somewhat Limited Monarchy.” (Mershon, Power of the Crown in the Valley of the Hudson, p. 42.)
This was the common law of England with respect to Crown grants of public lands. There is uncertainty, however, as to. whether the colonial assemblies ever adopted that part of the common law. The old popular assemblies adopted only so much of the English common law as they felt was applicable to conditions in the new country. (Gerard, Titles to Real Estate [3d ed.], p. 26.)
The prima facie rule of jus privatum had been lying dormant in England since the Grand Remonstrance (the reaction of the public to the opprobrious effect of Philpott) which led to the beheading of Charles I in 1649. ‘ ‘ There seems to have been no judicial affirmation of the jus privatum and jus publicum rule in English Courts until after the American Revolution.” It would be difficult to prove the prima facie rule was good law in England in 1777.
“ A careful study of these old colonial statutes reveals no authority for the proposition that riparian and littoral rights *528 were taken over from the English jurisprudence.” (Parsons, Public and Private Rights in the Foreshore, 22 Col. L. Rev. 706 [1922].) “ It is held that only such parts of the Common Law as with the Acts of the Colony in force on April 19,1775 formed part of the law of the Colony on that day, (1) were adopted by the State and (2) only such parts of the Common Law and Statute Law of England were brought by the Colonists with them as suited their condition or were applicable to their situation. Such general laws thereupon became the laws of the Colony until altered by common consent, or by legislative enactment. The principles and rules of the Common Law as applicable to this Country are held subject to modification and change according to the circumstances and conditions of the people and government here. By the English Common Law the King was the paramount proprietor and source of all titles to all lands within his dominion and it was considered to be held mediately or immediately of him. After the independence of the United States the title to lands formerly possessed by the English Crown in this Country passed to the people of the different States where the land lay, by virtue of the change of nationality and of the treaties made.” (Gerard, Titles to Real Estate [3d ed.], p. 26.)
The grant by Charles II to the Duke of York provided that the government over the lands, river, islands, etc., as granted to the Duke, should not be contrary to the laws and statutes of England. How did this therefore apply? The common law of England sustained the doctrine of divine right of kings. The sovereign had absolute authority over discovered and conquered lands, with the right to grant a charter of government according to his will and pleasure or to “ sell such land to friends or foe of the nation without consulting Parliament, which was a creature created by the Crown. ’ ’ (Power of the Crown, supra, p. 32). It does not appear though that the King intended to convey to the Duke a grant of such magnitude. (Martin v. Waddell, 41 U. S. 367.)
Present ownership in the tidelands of New York originated with the King and passed to the Duke by virtue of the “ second grant ” made June 29, 1674. Grants of land along the tideways, by letters patent issued by the authorized representatives of the Duke, the colonial Governors, were subject to the same limitations as those impressed upon the Duke. The patents did not grant the dominion and propriety in the navigable waters and in the soils under them to the Duke of York as private property to be parcelled out and sold to individuals for personal gain *529 but rather, the public domain granted by the patents was to be a trust for the common use of the new community about to be established. (Martin v. Waddell, supra.)
It therefore becomes apparent that no person can become invested with absolute ownership of these lands. Since the absolute ownership must be vested somewhere, the rule has been evolved that the absolute and ultimate right of property should be deemed to be vested in the “ sovereign or corporate power ” wherein the land lies. The corporate power is selected for the purpose of absolute ownership because “ it is the only one which is certain to survive the generations of men as they pass away. Wherever that Sovereign Power is represented by an individual as in England, there the absolute right of property to all lands in the Kingdom is vested in that individual. Whoever succeeds to the sovereignty succeeds to that right of property and holds it in trust for the nation.” (Bingham, Law of Real Property, P-3).
With the American Revolution, this sovereign representative proprietorship passed to the citizens of each State. (Martin v. Waddell, 41 U. S. 367, 410 [1842].) “ For when the Revolution took place, the people of each state became themselves sovereign; and in that character hold the absolute right to all their navigable waters and the soils under them for their own common use, subject only to the rights since surrendered by the Constitution to the general government.”
In this country, where the only sovereignty recognized in regard to real property is represented by the State in its corporate capacity, that absolute right of property is vested in the State. (Bingham, Law of Real Property, p. 3.)
The absolute title to lands under the water was said to have found its home in the sovereign. In People v. Hudson Riv. Connecting R. R. Corp. (228 N. Y. 203, 218) Mr. Justice Elkus said: ‘ ‘ The authority of the United States over the navigable waters is that of a supreme sovereign insofar as the authority is necessary under the interstate commerce provisions of the Constitution. As to all navigable waters, it has succeeded to the jus publicum, as held by the King of England and holds such waters in trust for all the people of the United States under the Constitution.”
The new Constitution of 1777 adopted so much of the English common law as was applicable to conditions in the New World and which was stated to be the law of the colony as of the 19th day of April in 1775 (N. Y. Const. [1777, Art. XXV]). All the pre-revolutionary patents were confirmed in the first New York *530 Constitution and that confirmation was ratified in each subsequent New York Constitution (Trustees of the Freeholders & Commonalty of the Town of Brookhaven v. Smith, 98 App. Div. 212, 214). “When, by the revolution, the colony of New York became separated from the Crown of Great Britain, and a republican government was formed, the People succeeded the King in the ownership of all lands within the state, which had not already been granted away, and they became from thenceforth the source of all private titles.” (People v. Trinity Church 22 N. Y. 44, 46.)
In New York the State as successor to the English Crown is the owner of the foreshore or tideway upon tidewaters within its jurisdiction, except where the Crown had parted with the title to such lands before the State succeeded the Crown as sovereign.
Various municipalities throughout the State of New York trace their claims to ownership of lands along the foreshore to pre-revolutionary war Crown grants. Letters patent from Governor Nicolls, confirmed and ratified by Governor Dongan, to the patentees in behalf of themselves and the freeholders and inhabitants of the Town of Huntington were a threefold grant (1) establishing a town and (2) designating a body corporate, the trustees of the freeholders and commonalty for the “ use and behoofe of ye said Freeholders and Inhabitants ” and (3) granting all of the lands previously settled by the patentees including 1 ‘ Rivers, Rivoletts, waters, lakes ’ ’.
The Andross Patent of 1677 granting to Richard Smith tracts of land in the territory that is now Smithtown was not so extensive. There are no words in this patent establishing a town nor does that grant convey rivers. “ By virtue of his majesties letters' Patent, and the Commission and authority unto me given by his Royall Highness, have ratified, confirmed and granted and by these presents do ratify confirm and grant unto said Richard Smith his heyres and assigns, the aforesaid parcels or tracts of land on both sides of the Nesaquake River. ’ ’ (Patent from Governor Andross, 1677.)
The Dongan Patent, by the very nature of the extent of it, is absolute and carries with it river beds (People v. System Props., 2 N Y 2d 330). This is not so with respect to Smith’s patent. Here, there is no language establishing a town nor the inclusion within the territory granted of rivers and “ rivoletts
Title to the land under the Nissequogue did not pass with the Andross patent, but was retained by the sovereign. When the State succeeded to the rights and titles of the Kang, the reservation in favor of the sovereign became vested in the State of New *531 York subject to the trust in favor of the people. It was not until the 18th day of June, 1963, that by letters patent, the people of the State of New York granted the land under the Nissequogue to the Town of Smithtown.
The extent of the conveyance was necessarily limited by the trust in favor of the people, the jus publicum, just as it affected the proprietary ownership of the grantor State. The people of the State of New York clearly have an interest in the enforcement of the trust in their favor that is engrafted upon the ownership of the Nissequogue. ‘ That the dominion and ownership of such lands is in the sovereign for the benefit of the public has long been settled. Such dominion and ownership of property generally implies the power of absolute disposition, but with respect to the land under navigable or tide waters an important limitation has been engrafted upon this power from the nature of the title * * * It is not a proprietary, but a sovereign right, and it has been frequently said that a trust is engrafted upon this title for the benefit of the public of which the state is powerless to divest itself.” (Coxe v. State of New York, 144 N. Y. 396, 405, 406.)
The limitation of the Duke’s power to convey free of the public trust passed to the State and anyone who secured a grant or patent from the State Government of lands under waters took the same subject to the rights of navigation, travel along the foreshores, fishing and bathing. This group of rights comprises what has been sometimes referred to as the * ‘ jus publicum ”. (Parsons, Public and Private Rights in the Foreshore, 22 Col. L. Rev. 706, 725, supra.)
The public trust inherent in the sovereign’s proprietary interest has been alluded to in other jurisdictions, and while the State was empowered to convey a portion of its proprietary interest in public lands, the power was always subject to restraints. “ The State can no more abdicate its trust over property in which the whole people are interested, like navigable waters and soils under them, so as to leave them entirely under the use and control of private parties, except in the instance of parcels mentioned for the improvement of the navigation and use of the waters, or when parcels can be disposed of without impairment of the public interest in what remains, than it can abdicate its police powers in the administration of government and the preservation of the peace ’ ’. (City of Milwaukee v. State, 193 Wis. 423, 456; see, also, Illinois Cent. R. R. Co. v. Illinois, 146 U. S. 387.) ‘1 The trust reposed in the State is not a passive trust; it is governmental, active, and administrative. Repre *532 senting the State in its legislative capacity, the legislature is fully vested with the power of control and regulation. The equitable title to these submerged lands vests in the public at large, while the legal title vests in the State, restricted only by the trust, and the trust, being both active and administrative, requires the law-making body to act in all cases where action is necessary, not only to preserve the trust, but to promote it.” (City of Milwaukee v. State, supra, p. 449.)
The thrust of Illinois Central and Milwaukee (supra) indicates that the State may not divest itself of the duty to regulate the use of navigable waters and tidelands. The State, for the purpose of enhancing the rights and interests of the whole people, may by appropriate means grant to individuals limited privileges in the lands under navigable waters, but not so as to divert them or the waters thereon from their proper uses for the public welfare, or so as to relieve the States respectively of the control and regulation of the uses afforded by the land and the waters, or so as to interfere with the lawful authority of Congress. “ Such abdication is not consistent with the exercise of the trust which requires the government of the State to preserve such waters for the use of the public. The trust devolving upon the State for the public and which can only be discharged by the management and control of the property in which the public has an interest, cannot be relinquished by a transfer of the property.” (1 Yannacone, Cohen and Davison, Environmental Rights and Remedies, Section 2:3.)
In New York Power & Light Corp. v. State of New York (230 App. Div. 338, 342) the court expressed a view consistent with the Milwaukee holding. Citing Smith v. City of Rochester (92 N. Y. 463) the court said, “ In this State control of the beds and waters of navigable streams rests, as an attribute of sovereignty * * * and cannot be unconditionally conveyed. ’ ’
It would appear to be unnecessary to undertake an exhaustive excursion into the historical development of the trust doctrine for the purpose of justifying its existence. The control and regulation of navigable waters and tideways was a matter of deep concern to sovereign governments dating back to the Romans. The earliest emphasis was placed upon the regulation of the navigable waters and foreshores as they related to the common right of the people for traditional uses such as navigation, fishing, the gathering of materials along the shore, and for recreation. The entire ecological system supporting the waterways is an integral part of them (the waterways) and must necessarily be included within the purview of the trust. *533 We now know that wetlands perform useful functions indeed. Wetlands are presently regarded as valuable national natural resources. They are sufficiently important to our environment to be accorded protection by State and national legislation. (Conservation Law, § 429-a, subd. 3, par. [3].) Concern about the loss or destruction of natural resources of the State including forests, soil, water, fish, and wildlife is expressed in paragraph (3) of subdivision 3 of section 429-a. The wetlands function as a buffer against the ravages of the sea, cleanser of the incoming tide, a base for the marine food chain, nesting grounds for birds and particularly endangered species and sanctuary to a variety of animals ferae naturae (a national natural resource in itself). (Geer v. Connecticut, 161 U. S. 519.)
The public interest demands the preservation and conservation of this vital natural resource rand the enforcement of protective measures against infringements by nominal owners, be they private or governmental. (Shively v. Bowlby, 152 U. S. 1, 13.) The court in its benchmark opinion declared “ That the title in the soil of the sea, or of arms of the sea, below ordinary high water mark, is in the King, except so far as an individual or a corporation has acquired rights in it by express grant, or by prescription or usage * * * and that this title, jus privatum, whether in the King or in a subject, is held subject to the public right, jus publicum ”.
Authority is thus provided for the management and control of soil below high water mark, whether the title is vested in the sovereign or in private ownership.
In the construction of grants to riparian owners of land bounded by a stream for the purpose of establishing upland boundaries, the courts of our States have uniformly held that the boundaries were marked by an imaginary line drawn by the average flow of the tide. The States were permitted to determine for themselves whether the ownership extended to the “low water mark” or the “high water mark”. The State of New York was one of six of the 13 original colonies that adopted the high-water mark. (Sage v. Mayor etc. of City of N. Y., 154 N. Y. 61; Fulton Light, Heat & Power Co. v. State of New York, 200 N. Y. 400; Gucker v. Town of Huntington, 254 App. Div. 10; Tiffany v. Town of Oyster Bay, 209 N. Y. 1.)
The court has been unable to discover any authority for the proposition that the ‘ ‘ mean high water mark ’ ’ marks the upland limits of the bed of a stream, nor have we succeeded in uncovering any construction that would have us conclude that the stream- *534 ward boundary of the foreshore coincided with the average high tide.
Clearly, neither the bed of the stream nor the foreshore is so limited. In Bacorn v. State of New York (20 Misc 2d 369, 373) the court said that certain regions were still to be considered a part of the bed of the Chemung River despite the fact that ‘ ‘ there was sometimes no water over this particular area. ’ ’ The river bed contemplated by the court was wholly without reference to the mean high water mark.
Foreshore is defined as “ the part of a seashore between the low-water line usu. at the seaward margin of a low-tide terrace and the upper limit of wave wash ‘ * * * usu. marked by a beach scarp or berm.” (Emphasis supplied; Webster’s Third New International Dictionary.)
“ Berm ” as used in the definition is “ the nearly horizontal portion of a beach generally bounded on one side or other by a beach ridge or beach scarp (waves wash across the beach to the [berm]).” (Webster’s Third New International Dictionary.)
As is evident, there is no reference to mean high water in either definition. On the contrary, the sentence used by Webster as illustrative of the meaning of berm would appear to indicate that the foreshore includes all of the area washed by waves. Casual observation would readily reveal that waves wash upland of mean high water.
If the trust doctrine may be upheld as a valid legal concept, its application with respect to navigable waters must be deemed to extend to the furthermost reaches.of the incoming tides. The corpus of the trust encompasses public lands and navigable waters, the people represent the- cestui que trust, and the sovereign is the trustee. It is the unqualified duty of the trustee to preserve the trust corpus for the benefit of the public (jus publicum). The jus publicum is nothing more than the great police power of the people. (Parsons, Public and Private Rights in the Foreshore, 22 Col. L. Rev. 706, 719, supra.) The State’s right to exercise dominion and control over its territory extends to and embraces the lands under the waters within its jurisdiction, and it may, in the exercise of its police power, enact such laws as will preserve from destruction the public right of fishery in its waters, and also protect private rights therein. (Colon v. Lisk, 13 App. Div. 195, 198.)
The proscription against the untrammeled use of the private property of the defendant does not offend the spirit of the Fifth and Fourteenth Amendments. “ The great police power is that reserved or inherent right in the people of all free gov *535 emments to regulate the use of privately owned property at the expense of the private owner in any way which may seem necessary in order to preserve the public health and safety.” (Parsons, Public and Private Rights in the Foreshore, 22 Col. L. Rev. 706, 719, supra.) (Tenement House Dept. of City of N. Y. v. Moeschen, 179 N. Y. 325.)
The ordinance provides in substance that persons are required to obtain a written permit from the Town Clerk, issued on the order of the town, before engaging in the removal or deposit of fill upon any watercourse or wetland. A grant of authority by the town to a licensee to deposit fill upon the ecological support system of a river would simultaneously diminish the system and the river, of which it is an integral part, to the detriment of the public’s interest. The dissenting opinion in Gould v. Hudson Riv. R. R. Co. (6 N. Y. 522, 546) pronounces the well-accepted principle that says: ‘ ‘ When regarding the rights of the state in respect to lands, we must not be unmindful, that it has two interests, one governmental, and the other proprietary. Or, as it is divided by M. Prudhon, in his Traite du Domain Public, the public domain, which is that kind of property which the government holds as mere trustee for the use of the public, such as public highways, navigable rivers, salt springs, and which are not, of course, alienable ’ ’.
Section 25B-7 of the Marine Law provides that the town may adopt a resolution directing the issuance of a permit for the removal or deposit of material when the removal or deposit does not violate standards described in section 25B-14 and that the public interest will not be adversely affected. Section 25B-14 which sets the standard for removing or depositing states: “ All operations under a permit issued pursuant to this local law shall be done in such a manner that the removal and/or deposition of material and the redepositing and storage thereof will neither undermine, weaken, nor deprive of support other lands in the vicinity, nor otherwise adversely affect the watercourses and wetlands of the town and the lands abutting, nor unless the permit issued pursuant hereto shall expressly provide otherwise, substantially change the course of any channel or the natural movement or flow of any waters or cause or accelerate the drift of soil, shale, mud, or bog, upland or underwater, nor adversely affect fish, shellfish, wildlife or other natural resources.”
No requirement is imposed upon the town to find that the work to be done will be in the aid of commerce and navigation or for some other public purpose, yet how can the town grant of a permit to remove or deposit material without the finding *536 of a public benefit be reconciled with the clear statement in Matter of City of New York (North Riv.) (122 Misc. 863, 864): ‘ ‘ These lands were within the navigable waters of the state, and, whether the city or the state held title, it was in trust for a public purpose for the benefit of the people and not in the capacity of private ownership. No diversion of ownership or use was permissible except in the aid of commerce and navigation or for some other public purpose.” The “public purpose” policy declared here is reflected in subdivision (2) of section 401 of the Conservation Law, where it is declared to be the public policy of the State of New York that “ the waters of the state be conserved and developed for all public beneficial uses ”.
Even if so alienated, the grant can only be considered to be of temporary duration. (Illinois Cent. R. R. Co. v. Illinois, supra.) The Supreme Court in New York went on to say in their North Biver (supra, p. 864) opinion: “A withdrawal of the open use of some parts of navigable waters to enable piers to be erected in aid of the commercial use of the water highway is necessary but the parts so appropriated cannot be diverted to a different use and the appropriation or encroachment upon the free use of the waters for navigation is coterminous with the existence of the use for a pier and abates with the discontinuance of that use. ’ ’
Lest there be some misunderstanding as to what is meant by the “ aid of commerce and navigation ”, it should be stated that commerce and navigation in its totality ought to be enhanced. The benefit derived by the public would be insufficient to warrant a diversion of ownership or use if such diversion in a given area results in a correspondingly greater injury elsewhere. On balance, any environmental enhancement should be of sufficient proportions to override any possible diminution occasioned by the altered environmental equilibrium.
The power of the State to assent to the alteration of a waterway is limited by doctrinal standards.- Can a municipal corporation: exert any greater power? Probably the clearest and most definitive statement of the extent of municipal powers is contained in the case of Hunter v. City of Pittsburgh (207 U. S. 161) and quoted in People ex rel. Williams Engr. & Contr. Co. v. Metz (193 N. Y. 148, 161, 162). “ ‘ Municipal corporations are political subdivisions of the State, created as convenient agencies for exercising such of the governmental powers of the State as may be intrusted to them ’ * * * Such corporations are the creatures, mere political subdivisions of the state for the purpose of exercising a part of its powers. They may *537 .exert only such powers as are expressly granted to them, or suph as may be necessarily implied from those granted. What they lawfully do of a public character is done under the sanction of the state. They are, in every essential sense, only auxiliaries of the state for the purposes of local government. They may be created, or, having been created, their powers may be restricted or enlarged or altogether withdrawn at the will of the legislature. The authority of the legislature, when restricting or withdrawing such powers, being subject only to the fundamental condition that the collective and individual rights of the people of a municipality shall not thereby be destroyed.” (People ex rel. Williams Engr. & Contr. Co. v. Metz, 193 N. Y. 148, 161, 162, citing Atkin v. Kansas, 191 U. S. 207, 220.)
Not only is there no evidence of a grant of powers by the State to the town which would enable the town to grant a permit, but the Legislature in enacting article 5 of the Conservation Law has reserved that power to the State (Conservation Law, § 400-a, snbd. 1). “ The sovereign power to regulate and control the water resources of this state ever since its establishment has been and now is vested exclusively in the State of New York, except to the extent of any delegation of power to the United States.” The New York State Constitution (art. IX, § 2, subd. [c], par. [i]) empowers local governments “to adopt and amend local laws not inconsistent with the provisions of this constitution or any general law ”. “ General law ’ ’ is defined in the constitution as “ a law which in terms and in effect applies alike to all counties, all counties other than those wholly included within a city, all cities, all towns or all villages ’ ’. (N. Y. Const., art. IX, § 3, snbd. [d], par. [1].) The Conservation Law has State-wide application and is a general law within the meaning of the Constitution.
The town ordinance is inconsistent with a State law of general application, as has been demonstrated, and therefore also inconsistent with the New York State Constitution (art. IX, § 2, subd. [c], par. [i]).
The findings of the court may be summarized as follows:
A. The trust doctrine continues in full force. Lands bounded by navigable waters, whether the subject of private or public ownership, are held subject to the public’s right to undiminished utility for public purposes. Neither the State nor riparian owner may grant or alienate any part of the foreshore for private purposes in derogation of the public interest.
B. The municipality, a mere creature of the State, may exercise only such power as is granted to it by statute or implication. *538 (People ex rel. Williams Engr. & Contr. Co. v. Metz, 193 N. Y. 148, supra.)
C. The State of New York in adopting section 400-a of the Conservation Law (L. 1965, ch. 955, § 5) effectively declared a proscription to the regulation and control of the water resources of the State by municipalities within the State.
D. The defendant is not obligated to apply to the Town Clerk of the Town of Smithtown, pursuant to an ordinance of the town, for a permit to place earth fill or to dredge within the wetlands of the Nissequogue River, when neither the town nor its agents possess the power to so grant. (Village of Fleischmanns v. Hyman, 164 Misc. 175; see, also, 25 Opns. St. Compt., 1969, p. 76.)
The earlier motions made by the defendant addressed to the form apd content of the information need not be resolved at this time, since the final motion to dismiss the information for the reason that the ordinance upon which it is based is unconstitutional, is granted.
It is not the intention of the court that the opinion expressed herein be construed as an open invitation to any and all who would similarly ravage our valuable wetlands. There remain provisions within the Conservation Law detailing procedures and penalties for noncompliance with said procedures, the adequacy of which the court leaves for legislative re-evaluation.
And, further, the court does not suggest that, in exercise of police power, the town may not prohibit the filling or removing of the wetlands in the Town of Smithtown. What the court is stating is that there can be no filling in of wetlands or removing soil from the ecological systems of rivers unless said filling or removing is done with strict adherence to the applicable provisions of article 5 of the Conservation Law or the superseding sections of article 15 of the Environmental Conservation Law (L. 1972, ch. 664, eft. Sept. 1,1972).
In view of the foregoing, the information is dismissed, as it would appear to be defective for the reason that it is based upon an ordinance that is unconstitutional.